## WILLIAMSON *v.* UNITED STATES.

### ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF OREGON.

No. 96. Argued December 5, 6, 1907.—Decided January 6, 1908.

Where the writ of error is prosecuted directly from this court on constitutional grounds, but there are errors assigned as to other subjects, this court has jurisdiction to review the whole case if any constitutional question is adequate to the exercise of jurisdiction. *Burton* v. *United States,* 196 U. S. 283.

An objection taken by a member of Congress that he cannot be sentenced during his term of office on the ground that it would interfere with his constitutional privilege from arrest is not frivolous even though taken during recess of Congress, and such a claim involves a constitutional question sufficient to give this court jurisdiction to review the judgment by writ of error. *Burton* v. *United States,* 196 U. S. 283.

The jurisdiction of this court to review on direct writ of error depends on the existence of a constitutional question at the time when the writ of error is sued out, and even if that question subsequently and before the

case is reached becomes an abstract one, jurisdiction remains and this court must review the whole case.

If a sentence on a member of Congress is illegal when pronounced because in conflict with his constitutional privilege it does not become valid by the expiration of the term for which he was elected.

The words "treason, felony and breach of the peace" were used by the framers of the Constitution in § 6, Art. I, and should be construed, in the same sense as those words were commonly used and understood in England as applied to the parliamentary privilege, and as excluding from the privilege all arrests and prosecutions for criminal offenses, and confining the privilege alone to arrests in civil cases.

Under § 5440, Rev. Stat., the conspiracy to commit a crime against the United States is itself the offense without reference to whether the crime which the conspirators have conspired to commit is consummated, or agreed upon by the conspirators in all its details. And an indictment charging the accused with a conspiracy to commit the crime of subornation of perjury in proceedings for the purchase of public lands was held in this case to be sufficient, although the precise persons to be suborned, and the time and place of such suborning were not particularized.

On the trial of one charged with conspiracy to commit a crime against the United States in connection with the purchase of public lands, testimony showing the character of the lands and an attempt by the accused to acquire state lands is competent as tending to establish guilty intent, purpose, design or knowledge, and is admissible if the trial judge so limits its application as to prevent it from improperly prejudicing the accused by showing the commission of other crimes. *Holmes* v. *Goldsmith*, 147 U. S. 164.

The rule that where it plainly appears in a criminal case that there is no evidence justifying conviction this court will so hold, despite a failure to request an instruction for acquittal, does not apply to a case where it is not certified, and this court is not otherwise satisfied, that the bill of exceptions contains the entire evidence, or where the bill of exceptions recites that the plaintiff offered evidence to go to the jury on every material allegation in the indictment.

While one honestly following advice of counsel, which he believes to be correct, cannot be convicted of crime which involves willful and unlawful intent even if such advice were an inaccurate construction of the law, no man can willfully and knowingly violate the law and excuse himself from the consequences thereof by pleading that he followed advice of counsel.

In a criminal case doubt must be resolved in favor of the accused and in this case, *held*, that an indictment for conspiracy to suborn perjury related to statements under § 2 of the Timber and Stone Act and not in respect to making of final proofs.

Under the Timber and Stone Act of June 3, 1878, 20 Stat. 89, an applicant is not required, after he has made his preliminary sworn statement concerning the *bona fides* of his application and the absence of any contract

or agreement in respect to the title, to additionally swear to such facts on final proof, and a regulation of the Land Commissioner exacting such additional statement at the time of final hearing is invalid.

While Congress has given the Land Commissioner power to prescribe regulations to give effect to the Timber and Stone Act, the rules prescribed must be for the enforcement of the statute and not destructive of the rights which Congress has conferred by the statute.

THE facts are stated in the opinion.

. *Mr. Charles A. Keigwin* and *Mr. Charles A. Douglas,* with whom *Mr. W. B. Matthews* and *Mr. E. B. Sherrill* were on the brief, for plaintiff in error:

Plaintiff in error, being at the time of the trial a member of the House of Representatives of the United States, was not subject to arrest except for treason, felony or breach of the peace. Constitution U. S., Art. I, § 6.

Felonies, in the sense of the Constitution and of Federal statutes, are only such offenses as were felonies at common law or so declared by statute. *Reagan* v. *United States,* 157 U. S. 301; *Bannon* v. *United States,* 156 U. S. 464. So as to conspiracy, which is not a felony simply because it is an infamous offense. *Bannon* v. *United States, supra; Mackin* v. *United States,* 117 U. S. 348; *Ex parte Wilson,* 114 U. S. 417.

The phrase "breach of the peace" means only actual breaches of the peace, offenses involving violence or public disturbance. As to other misdemeanors, the parliamentary privilege applies, as in libel. *Rex* v. *Wilkes,* 2 Wilson, 151; *Ware* v. *Circuit Judge,* 75 Michigan, 488; *Estes* v. *State,* 2 Humphrey, 496.

. The constitutional immunity from arrest includes immunity from imprisonment, save in the cases excepted. The arrest is prohibited, not because a mere arrest is likely to impair the discharge of legislative duty, but because it implies and leads to imprisonment which does have that effect.

An indictment which charges a conspiracy between two or more persons to solicit or attempt to suborn other persons, not parties to the conspiracy, to commit perjury, does not charge a conspiracy to commit an offense against the United

States. It is not an offense against the United States to solicit or attempt to suborn another person to commit perjury.

There are no common law offenses against the United States; an offense, to be indictable in the Federal courts, must be one created and defined by act of Congress. *United States* v. *Hudson,* 7 Cranch, 32; *State* v. *Wheeling Bridge Co.,* 13 How. 563; *United States* v. *Britton,* 108 U. S. 193. An indictment under cl. 1 of § 5440, Rev. Stat., must allege, as the object of the conspiracy, a statutory offense against the United States. *United States* v. *Payne,* 22 Fed. Rep. 426; *Re Wolf,* 27 Fed. Rep. 611; *United States* v. *Adler,* 49 Fed. Rep. 736; *United States* v. *Taffe,* 86 Fed. Rep. 113; *United States* v. *Melfi,* 118 Fed. Rep. 899; *United States* v. *Britton,* 108 U. S. 193.

At common law, subornation of perjury is the offense of procuring a man to take a false oath, amounting to perjury, who actually takes such oath. 1 Hawkins P. C., Curw. ed., 435; 2 Bishop on Criminal Law, § 1197.

By § 5393, Rev. Stat., it is provided that "Every person who procures another to commit any perjury is guilty of subornation of perjury." The offense against the United States constituted by this section is identical with the common law crime of subornation of perjury. It is essential, under this section, as at the common law, that perjury shall in fact have been committed. *United States* v. *Dennee,* 3 Woods, 39; *United States* v. *Wilcox,* 3 Blatchf. 393; *United States* v. *Evans,* 19 Fed. Rep. 912; *United States* v. *Howard,* 132 Fed. Rep. 325; *United States* v. *Cobban,* 134 Fed. Rep. 290.

If an actual attempt to suborn the commission of perjury does not constitute an offense against the United States, a conspiracy by two or more persons to solicit or to attempt to suborn other persons to commit perjury is not a conspiracy to commit an offense against the United States, and is not punishable under § 5440, Rev. Stat.

The ruling of the court that perjury at the final proof was within the averments of the indictment was prejudicial error.

The charge is limited to alleged perjury in the preliminary

written statements. The introduction of evidence showing perjury in the final proofs was an attempt to prove the commission of another crime than that set out in the indictment. This independent offense, if committed at all, was committed by strangers to the conspiracy.

An officer, having by statute power to prescribe regulations for the conduct of his official business, may enforce the same by his official authority; but he cannot make the disregard of his requirements a criminal offense. *United States* v. *Eaton,* 144 U. S. 677; *United States* v. *Manion,* 44 Fed. Rep. 800; *United States* v. *Bedgood,* 49 Fed. Rep. 54; *United States* v. *Blasingame,* 116 Fed. Rep. 654; *United States* v. *Maid,* 116 Fed. Rep. 650; *United States* v. *Howard,* 37 Fed. Rep. 666.

The applicants had the right to sell, or to contract to sell, the lands at any time after application made, whether before or after final proof. The assumption to the contrary, upon which the whole theory of the possibility of perjury in the final proof is made to rest, is wholly unfounded upon any provision of the statute, contrary to the clear implication of the act of 1878, to the general principles of public-land law on the subject, and the decisions of this court.

In the absence of some express statutory inhibition, any right or claim under the public-land laws is assignable at any stage of its development. *Thredgill* v. *Pintard,* 12 How. 24; *Sparrow* v. *Strong,* 3 Wall. 97; *Lamb* v. *Davenport,* 18 Wall. 307.

A prohibition against such assignment will not be extended by construction to apply at a later stage of the proceeding than is made necessary by the words of the statute. *Myers* v. *Croft,* 13 Wall. 291. Nor can such a prohibition in another act in *pari materia* be read into an act in which no such prohibition is inserted by the legislature. *French* v. *Spencer,* 21 How. 228; *Maxwell* v. *Moore,* 22 How. 185.

The right to make a soldier's additional homestead entry is assignable, although an original homestead is not. *Webster* v. *Luther,* 163 U. S. 331; *Barnes* v. *Poirier,* 27 U. S. App. 500. See also *Adams* v. *Church,* 193 U. S. 510.

*The Attorney General* and *Mr. William R. Harr,* Special Assistant to the Attorney General, with whom *The Solicitor General* was on the brief, for defendant in error:

The writ of error should be dismissed for want of jurisdiction. There is not now and never has been, properly speaking, a constitutional question involved in this case.

The mere assertion of a constitutional privilege, without color of ground to support it, is not sufficient to confer jurisdiction on this court to review the judgment of the Circuit Court. *Lampasas* v. *Bell,* 180 U. S. 282. See also *Water Co.* v. *Newburyport,* 193 U. S. 561, 576; *Railroad Co.* v. *Castro,* 204 U. S. 453, 455; *Kent* v. *Porto Rico, ante,* p. 113.

Even if the offense is not included within the exception to the privilege, and the imposition of sentence would amount to an arrest, color for the assertion of such privilege exists only when a Senator or Representative is threatened with arrest while in attendance at the session of their respective Houses or in going to and returning from the same. The contention that the privilege extends to freedom from arrest two months before Congress will meet, is frivolous, and could have been made for jurisdictional purposes only.

Sentence is not an arrest. At most it is but an order for arrest, although generally followed in this country by a warrant of commitment. Bishop's New Crim. Pro., 4th ed., § 1337. An unexecuted order for arrest is not in itself an arrest, and in this case the sentence, even treating it as such an order, was suspended during the entire time that plaintiff in error was a member of Congress.

The privilege of immunity extends to civil arrests only, and does not apply to any indictable offense. 1 Hartsell's Precedents of Proceedings in House of Commons, 2, 40, 65, 66; *Wilkinson* v. *Boulton,* 1 Levinz, 163; *Mr. Long Wellesley's Case,* 2 Rus. & Myl. 639, 664, 665; *Rawlins* v. *Ellis,* 10 Jurist, pt. 1, p. 1039; Bowyer's Com. on Const. Law of Eng., 2d ed., p. 84; May's Law of Parliament, 145.

Actual personal violence is not an essential element of breach

of the peace, but any conduct destructive of peace and good morals is sufficient to establish the offense. *People* v. *Rounds,* 35 N. W. Rep. 77, 79; *S. C.,* 67 Michigan, 482; *Davis* v. *Burgess,* 20 N. W. Rep. 540, 542; *S. C.,* 54 Michigan, 514; Bishop's Crim. Law, 7th ed., § 945; *Dunn* v. *The Queen,* 12 Ad. & Ellis, N. S. 1031, 1039, note; *O'Connell* v. *The Queen,* 11 Clark & Fin. 155, 251.

Conspiracy to commit subornation of perjury is an offense against the United States. *Clune* v. *United States,* 159 U. S. 595; *Callan* v. *Wilson,* 127 U. S. 540, 555.

The indictment is sufficient; it states the object of the conspiracy with all the precision and detail as to time, place, and other details that are necessary in indictments for the commission of such offense. *Ching* v. *United States,* 118 Fed. Rep. 540; *United States* v. *Stevens,* 44 Fed. Rep. 141; *United States* v. *Wilson,* 60 Fed. Rep. 890.

When the object of the conspiracy is an act in itself unlawful, the means by which it was to be accomplished need not be set out in the indictment. *Rex* v. *Eccles,* 1 Leach's Crown Cases, 274; *Thomas* v. *People,* 113 Illinois, 531; *People* v. *Clark,* 10 Michigan, 310; *People* v. *Bird,* 126 Michigan, 631; *People* v. *Arnold,* 46 Michigan, 268, 271. See also *Pettibone* v. *United States,* 148 U. S. 197, 203.

While not provided by the express words of the statute, the Timber and Stone Act, in purpose and intent, prohibits an applicant, at any time before the completion of his entry, from making any contract or agreement by which the title he may acquire shall inure to the benefit of any other person, otherwise the expressed intention of the statute that the lands applied for should not inure to the benefit of any other person, and that it should not be sold in quantities exceeding one hundred and sixty acres to any one person, would be defeated. *United States* v. *Budd,* 144 U. S. 163.

As it is the policy of the Timber and Stone Act to withhold the power of alienation from the person desiring to purchase the land until he has completed his entry, the Land Commis-

sioner must not only possess authority to make rules to that effect, but it is his duty to make and enforce them for the protection of the Government, and 'the courts of the United States will take judicial notice of such rules. *Caha* v. *United States*, 152 U. S. 221; *Cosmos Co.* v. *Gray Eagle Co.*, 190 U. S. 309.

The regulations made by the Commissioner of the General Land Office for the purpose of carrying into effect the Timber and Stone Act in its true intent and purpose merely provided a place and an occasion and opportunity where perjury might be committed. *United States* v. *Bailey*, 9 Pet. 238; *Adams* v. *Church*, 193 U. S. 510, discussed and distinguished.

MR. JUSTICE WHITE delivered the opinion of the court.

This writ of error to review a criminal conviction is prosecuted directly from this court upon the assumption that rights under the Constitution are involved. The errors assigned, however, relate not only to such question but also to many other subjects. If there be a constitutional question adequate to the exercise of jurisdiction, the duty exists to review the whole case. *Burton* v. *United States*, 196 U. S. 283.

The constitutional question relied on thus arose:

On February 11, 1905, Williamson, plaintiff in error, while a member of the House of Representatives of the United States, was indicted with two other persons for alleged violations of Rev Stat. § 5440, in conspiring to commit the crime of subornation of perjury in proceedings for the purchase of public land under the authority of the law commonly known as the Timber and Stone Act. The defendants were found guilty in the month of September, 1905. On October 14, 1905, when the court was about to pronounce sentence, Williamson—whose term of office as a member of the House of Representatives did not expire until March 4, 1907—protested against the court passing sentence upon him, and especially to any sentence of imprisonment, on the ground that thereby

he would be deprived of his constitutional right to go to, attend at and return from the ensuing session of Congress. The objection was overruled and Williamson·was sentenced to pay a fine and to imprisonment for ten months. Exceptions were taken both to the overruling of the preliminary objection and to the sentence of imprisonment. Upon these exceptions assignments of error are based, which it is asserted present a question as to the scope and meaning of that portion of Article I, section 6, clause 1, of the Constitution, relating to the privilege of Senators and Representatives from arrest during their attendance on the session of their respective Houses, and in going to and returning from the same.

At the threshold it is insisted by the Government that the writ of error should be dismissed for want of jurisdiction. This rests upon the proposition that the constitutional question urged is of such a frivolous character as not to furnish a basis for jurisdiction, or if not frivolous at the time when the sentence was imposed, it is now so. The first proposition assumes that it is so clear that the constitutional privilege does not extend to the trial and punishment during his term of office of a Congressman for crime that any assertion to the contrary affords no basis for jurisdiction. It is not asserted that it has ever been finally settled by this court that the constitutional privilege does not prohibit the arrest and punishment of a member of Congress for the commission of any criminal offense. The contention must rest therefore upon the assumption that the text of the Constitution so plainly excludes all criminal prosecutions from the privilege which that instrument accords a Congressman as to cause the contrary assertion to be frivolous. But this conflicts with *Burton* v. *United States, supra,* where, although the scope of the privilege was not passed upon, it was declared that a claim interposed by a Senator of the United States of immunity from arrest in consequence of a prosecution and conviction for a misdemeanor involved a constitutional question of such a character as to give jurisdiction to this court by direct writ

of error.  It is said, however, that this case differs from the
*Burton case,* because there the trial and conviction was had
during a session of the Senate, while here, at the time of the
trial, conviction and sentence Congress was not in session, and
therefore to assert the protection of the constitutional provision
is to reduce the claim "to the point of frivolousness."  This,
however, but assumes that, even if the constitutional privilege
embraces the arrest and sentence of a member of Congress for
a crime like the one here involved, it is frivolous to assert that
the privilege could possibly apply to an arrest and sentence at
any other time than during a session of Congress, even although
the inevitable result of such arrest and sentence might be an
imprisonment which would preclude the possibility of the
member attending an approaching session.  We cannot give
our assent to the proposition.  Indeed, we think, if it be con-
ceded that the privilege which the Constitution creates ex-
tends to an arrest for any criminal offense, such privilege
would embrace exemption from any exertion of power by way
of arrest and prosecution for the commission of crime, the
effect of which exertion of power would be to prevent a Con-
gressman from attending a future as well as a pending session
of Congress.  The contention that although there may have
been merit in the claim of privilege when asserted it is now
frivolous because of a change in the situation, is based upon
the fact that at this time the Congress of which the accused
was a member has ceased to exist, and, therefore, even if the
sentence was illegal when imposed, such illegality has been
cured by the cessation of the constitutional privilege.  But,
even if the proposition be conceded, it affords no ground for
dismissing the writ of error, since our jurisdiction depends
upon the existence of a constitutional question at the time
when the writ of error was sued out, and such jurisdiction,
as we have previously said, carries with it the duty of re-
viewing any errors material to the determination of the validity
of the conviction.  It hence follows that, even if the constitu-
tional question as asserted is now "a mere abstraction," that

fact would not avail to relieve us of the duty of reviewing the whole case, and hence disposing of the assignments of error which are addressed to other than the constitutional question. Besides, we do not consider the proposition well founded, for, if at the time the sentence was imposed it was illegal because in conflict with the constitutional privilege of the accused, we fail to perceive how the mere expiration of the term of Congress for which the member was elected has operated to render that valid which was void because repugnant to the Constitution.

We come, then, to consider the clause of the Constitution relied upon in order to determine whether the accused, because he was a member of Congress, was privileged from arrest and trial for the crime in question, or, upon conviction, was in any event privileged from sentence, which would prevent his attendance at an existing or approaching session of Congress.

The full text of the first clause of section 6, Article I, of the Constitution is this:

"Sec. 6. The Senators and Representatives shall receive a Compensation for their Services, to be ascertained by Law, and paid out of the Treasury of the United States. They shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place."

If the words extending the privilege to all cases were unqualified, and therefore embraced the arrest of a member of Congress for the commission of any crime, we think, as we have previously said, they would not only include such an arrest as operated to prevent the member from going to and returning from a pending session, but would also extend to prohibiting a court during an interim of a session of Congress from imposing a sentence of imprisonment which would prevent him from attending a session of Congress in the future. But the question is not what would be the scope of the words

"all cases" if those words embraced all crimes, but is, what is the scope of the qualifying clause—that is, the exception from the privilege of "treason, felony and breach of the peace." The conflicting contentions are substantially these: It is insisted by the plaintiff in error that the privilege applied because the offense in question is confessedly not technically the crime of treason or felony and is not embraced within the words " breach of the peace," as found in the exception, because "the phrase ' breach of the peace ' means only actual breaches of the peace, offenses involving violence or public disturbance." This restricted meaning, it is said, is necessary in order to give effect to the whole of the excepting clause, since, if the words " breach of the peace" be broadly interpreted so as to cause them to embrace all crimes, then the words treason and felony will become superfluous. On the other hand, the Government insists that the words " breach of the peace " should not be narrowly construed, but should be held to embrace substantially all crimes, and therefore, as in effect, confining the parliamentary privilege exclusively to arrest in civil cases. And this is based not merely upon the ordinary acceptation of the meaning of the words, but upon the contention that the words "treason, felony and breach of the peace," as applied to parliamentary privilege, were commonly used in England prior to the Revolution and were there well understood as excluding from the parliamentary privilege all arrests and prosecutions for criminal offenses; in other words, as confining the privilege alone to arrests in civil cases, the deduction being that when the framers of the Constitution adopted the phrase in question they necessarily must be held to have intended that it should receive its well understood and accepted meaning. If the premise upon which this argument proceeds be well founded, we think there can be no doubt of the correctness of the conclusion based upon it. Before, therefore, coming to elucidate the text by the ordinary principles of interpretation we proceed to trace the origin of the phrase "treason, felony and breach of the peace," as applied to parliamentary privilege, and to fix the meaning

of those words as understood in this country and in England prior to and at the time of the adoption of the Constitution. In the Articles of Confederation (last clause of Article V) it was provided:

"Freedom of speech and debate in Congress shall not be impeached or questioned in any court, or place out of Congress, and the members of Congress shall be protected in their persons from arrest and imprisonments, during the time of their going to and from, and attendance on Congress, except for treason, felony, or breach of the peace."

In article V of "Mr. Charles Pinckney's Draft of a Federal Government" it was provided as follows (Elliott's Deb., p. 146):

"In each house a majority shall constitute a quorum to do business. Freedom of speech and debate in the legislature shall not be impeached or questioned, in any place out of it; and the members of both houses shall, in all cases except for treason, felony, or breach of the peace, be free from arrest during their attendance on Congress, and in going to and returning from it. . . ."

The propositions offered to the convention by Mr. Pinckney with certain resolutions of the convention were submitted to a Committee of Detail for the purpose of reporting a constitution. Section 5 of Article VI of the draft of Constitution reported by this committee was as follows (Elliott's Debates, p. 227):

"SEC. 5. Freedom of speech and debate in the legislature shall not be impeached or questioned in any court or place out of the legislature; and the members of each house shall, in all cases, except treason, felony, and breach of the peace, be privileged from arrest during their attendance at Congress, and in going to and returning from it."

The clause would seem not to have been the subject of debate. 3 Doc. Hist. of Constitution (Dept. of State, 1900), 500. In Elliott's Debates (p. 237) it is recited as follows:

"On the question to agree to the fifth section of the sixth article, as reported, it passed in the affirmative."

And, in the revised draft, the section was reported by the Committee of Revision exactly as it now appears (Elliott's Debates, p. 299).

The presence of the exact words of the exception as now found in the Constitution, in the Articles of Confederation, and the employment of the same words "treason, felony and breach of the peace," without discussion, in all the proceedings of the convention relating to the subject of the privileges of members of Congress, demonstrate that those words were then well known as applied to parliamentary privilege and had a general and well understood meaning, which it was intended that they should continue to have. This follows, because it is impossible to suppose that exactly like words without any change whatever would have been applied by all those engaged in dealing with the subject of legislative privilege, unless all had a knowledge of those words as applied to the question in hand and contemplated that they should continue to receive the meaning which it was understood they then had. A brief consideration of the subject of parliamentary privilege in England will, we think, show the source whence the expression "treason, felony and breach of the peace" was drawn, and leave no doubt that the words were used in England for the very purpose of excluding all crimes from the operation of the parliamentary privilege, and therefore to leave that privilege to apply only to prosecutions of a civil nature. We say this, although the King's Bench, in 1763 (*Rex* v. *Wilkes*, 2 Wils. 151), held that a member of Parliament was entitled to assert his privilege from arrest upon a charge of publishing a seditious libel, the court ruling that it was not a breach of the peace. But, as will hereafter appear, Parliament promptly disavowed any right to assert the privilege in such cases.

In Potter's Dwarris on Statutes, p. 601, reference is made to expressions of Lord Mansfield, advocating in 1770 the passage of a bill—which ultimately became a law—whose provisions greatly facilitated the prosecution of civil actions against members of Parliament, and restrained only arrests of their persons

in such actions. The remarks of Lord Mansfield having been made so shortly before the Revolution, and referring, as they undoubtedly did, to the decision in the *Wilkes case* (2 Wils. 151), are of special significance. Among other things he said:

"It may not be popular to take away any of the privileges of Parliament, for I very well remember, and many of your Lordships may remember, that not long ago the popular cry was for an extension of privileges, and so far did they carry it at that time that it was said that privilege protected members from criminal actions, and such was the power of popular prejudice over weak minds that the very decisions of some of the courts were tinctured with that doctrine. . . . The laws of this country allow no place or employment as a sanctuary for crime, and where I have the honor to sit as judge neither royal favor nor popular applause shall ever protect the guilty. . . . Members of both houses should be free in their persons in cases of civil suits, for there may come a time when the safety and welfare of this whole empire may depend upon their attendance in Parliament. God forbid that I should advise any measure that would in future endanger the state. But this bill has no such tendency. It expressly secures the persons of members from arrest in all civil suits."

Blackstone, in 1765, discussing the subject of the privileges of Parliament, says (Lewis's ed., *165):

"Neither can any member of either house be arrested and taken into custody, unless for some indictable offense, without a breach of the privilege of Parliament."

And, speaking of the writ of privilege which was employed to deliver the party out of custody when arrested in a civil suit, he said (p. 166):

"It is to be observed that there is no precedent of any such writ of privilege, but only in civil suits; and that the statute of 1 Jac. I, c. 13, and that of King William (which remedy some inconveniences arising from privilege of Parliament), speak only of civil actions. And therefore the claim of privilege hath been usually guarded with an exception as to the case of indictable

crimes; or, as it has been frequently expressed, of treason, felony and breach (or surety) of the peace. Whereby it seems to have been understood that no privilege was allowable to the members, their families or servants, in any *crime* whatsoever, for all crimes are treated by the law as being *contra pacem domini regis*. And instances have not been wanting wherein privileged persons have been convicted of misdemeanors, and committed, or prosecuted to outlawry, even in the middle of a session; which proceeding has afterwards received the sanction and approbation of Parliament. To which may be added that a few years ago the case of writing and publishing seditious libels was resolved by both houses not to be entitled to privilege; and that the reasons upon which that case proceeded extended equally to every indictable offense."

The first volume of Hatsell's Precedents, published in April, 1776, is entitled as "relating to privilege of Parliament; from the earliest records to the year 1628: with observations upon the reign of Car. I, from 1628 to 4 January, 1641." The material there collected has been frequently employed in support of the statement that the terms "treason, felony and breach of the peace" were employed by the Commons in a broad and not in a restricted sense. And in the concluding chapter (V), after stating (4th ed., 205) "the principal view, which the House of Commons seems always to have had in the several declarations of their privileges," the author says (p. 206):

"Beyond this, they seem never to have attempted; there is not a single instance of a member's claiming the privilege of Parliament, to withdraw himself from the criminal law of the land: for offenses against the public peace they always thought themselves amenable to the laws of their country: they were contented with being substantially secured from any violence from the Crown, or its ministers; but readily submitted themselves to the judicature of the King's Bench, the legal court of criminal jurisdiction; well knowing that 'Privilege which is allowed in case of public service for the Commonwealth, must not be used for the danger of the Commonwealth;' or, as it is

expressed in Mr. Glynn's Report of the sixth of January, 1641, 'They were far from any endeavor to protect any of their members, who should be, in due manner, prosecuted according to the Laws of the Realm, and the Rights and Privileges of Parliament, for treason, or any other misdemeanor; being sensible, that it equally imported them, as well to see justice done against them that are criminous, as to defend the just Rights and Liberties of the Subjects, and Parliament of England.'"

May, in his treatise on the Law, Privileges, Proceedings and Usage of Parliament, first published in 1844, says (10th ed., p. 112):

"The privilege of freedom from arrest has always been limited to civil causes, and has not been allowed to interfere with the administration of criminal justice. In *Larke's case*, in 1429, the privilege was claimed, 'except for treason, felony or breach of the peace;' and in *Thorpe's case* the judges made exceptions to such cases as be 'for treason, or felony, or surety of the peace.' The privilege was thus explained by a resolution of the Lords, 18th April, 1626: 'That the privilege of this house is, that no peer of Parliament, sitting the Parliament, is to be imprisoned or restrained without sentence or order of the house, unless it be for treason or felony, or for refusing to give surety of the peace;' and again, by a resolution of the Commons, 20th May, 1675, 'that by the laws and usage of Parliament, privilege of Parliament belongs to every member of the House of Commons, in all cases except treason, felony and breach of the peace.'

"On the 14th April, 1697, it was resolved, 'That no member of this house has any privilege in case of breach of the peace, or forcible entries, or forcible detainers;' and in *Wilkes' case*, 29th November, 1763, although the Court of Common Pleas had decided otherwise, it was resolved by both houses,

"'That privilege of Parliament does not extend to the case of writing and publishing seditious libels, nor ought to be allowed to obstruct the ordinary course of laws in the speedy

and effectual prosecution of so heinous and dangerous an offence.'

" 'Since that time,' said the committee of privileges, in 1831, 'it has been considered as established generally, that privilege is not claimable for any indictable offence.'

"These being the general declarations of the law of Parliament, one case will be sufficient to show how little protection is practically afforded by privilege, in criminal offences. In 1815, Lord Cochrane, a member, having been indicted and convicted of a conspiracy, was committed by the Court of King's Bench to the King's Bench Prison. Lord Cochrane escaped, and was arrested by the marshal, whilst he was sitting on the privy councillor's bench, in the House of Commons, on the right hand of the chair, at which time there was no member present, prayers not having been read. The case was referred to the committee of privileges, who reported that it was 'entirely of a novel nature, and that the privileges of Parliament did not appear to have been violated, so as to call for the interposition of the house, by any proceedings against the marshal of the King's Bench.' "

. See, also, Bowyer's Com. on Const. Law of England (2d ed.), p. 84.

In what is styled *Mr. Long Wellesley's Case*, decided in 1831, 2 Russ. and Mylne, 639, the party named had been taken into custody for clandestinely removing his infant daughter, a ward of the court, from the place where such ward was residing under authority of the court. The question for decision arose upon a motion to discharge the order for commitment "on the ground that, as a member of the House of Commons, he was protected from attachment by the privilege of Parliament." As stated in the report of the case, the committee of privileges of the House of Commons, which had the matter of the arrest of Mr. Wellesley under consideration, decided, p. 644, "that Mr. Long Wellesley's claim to be discharged from imprisonment by reason of privilege of Parliament ought not to be admitted." On the subject of the extent of the privilege, counsel,

who as *amicus curiæ* contended that the order of commitment was invalid, made an elaborate reference to authorities and pertinent statutes. Lord Chancellor Brougham, however, decided that privilege of Parliament was no protection against an attachment for what was in its nature a criminal contempt. Among other things he observed that upon principle members of Parliament could not be placed by privilege of Parliament above the law, and held (p. 665) "that he who has privilege of Parliament, in all civil matters, matters which whatever be the form are in substance of a civil nature, may plead it with success, but that he can in no criminal matter be heard to urge such privilege."

And by text-writers of authority in this country it has been recognized from the beginning that the convention which framed the Constitution, in adopting the words " treason, felony and breach of peace " as applicable to the privileges of a parliamentary body, used those words in the sense which the identical words had been settled to mean in England.

Story, in his treatise on the Constitution, speaking of the subject, says:

"SEC. 859. The next part of the clause regards the privilege of the members from arrest, except for crimes, during their attendance at the sessions of Congress, and their going to and returning from them. This privilege is conceded by law to the humblest suitor and witness in a court of justice; and it would be strange indeed if it were denied to the highest functionaries of the State in the discharge of their public duties. It belongs to Congress in common with all other legislative bodies which exist, or have existed in America since its first settlement, under every variety of government, and it has immemorially constituted a privilege of both houses of the British Parliament. It seems absolutely indispensable for the just exercise of the legislative power in every nation purporting to possess a free constitution of government, and it cannot be surrendered without endangering the public liberties as well as the private independence of the members.

  *  *  *  *  *  *  *  *

"Sec. 865. The exception to the privilege is, that it shall not extend to 'treason, felony, or breach of the peace.' These words are the same as those in which the exception to the privilege of Parliament is usually expressed at the common law, and were doubtless borrowed from that source. Now, as all crimes are offenses against the peace, the phrase 'breach of the peace' would seem to extend to all indictable offenses, as well those which are in fact attended with force and violence, as those which are only constructive breaches of the peace of the government, inasmuch as they violate its good order. And so, in truth, it was decided in Parliament, in the case of a seditious libel published by a member (Mr. Wilkes) against the opinion of Lord Camden and the other judges of the court of common pleas, and, as it will probably now be thought, since the party spirit of those times has subsided, with entire good sense and in furtherance of public justice. It would be monstrous that any member should protect himself from arrest or punishment for a libel, often a crime of the deepest malignity and mischief, while he would be liable to arrest for the pettiest assault or the most insignificant breach of the peace."

Cushing, in his treatise—first published in 1856—on the elements of the law and practice of legislative assemblies in the United States, declared (9th ed., § 546) that the Commons never went "the length of claiming any exemption from the operation of the criminal laws;" and the author closed a discussion of the cases to which the privilege of Parliament was applicable (§§ 559–563) by expressing an opinion "in favor of the broad rule which withdraws the protection of parliamentary privilege from offenses and criminal proceedings of every description." And, considering the privilege as affected by the Constitution of the United States and of the several States, he said:

"567. In the greater number of the constitutions it is expressly provided, that members shall be privileged from arrest, during their attendance at the session of their respective houses, and in going to and returning from the same, in all cases, ex-

cept 'treason, felony, and breach of the peace.' This it will
be recollected is the form in which the privilege is stated by
Sir Edward Coke, and in which it is usually expressed by the
English writers on parliamentary law; and it was undoubtedly
adopted in the constitutions as correctly expressing the par-
liamentary rule on the subject. The inaccuracy of the lan-
guage has already been pointed out, and it has been shown,
that, in England, the exception embraces all criminal matters
whatsoever, and, of course, includes many cases which do not
fall within the denomination either of treason, felony, or breach
of the peace. The question, therefore, arises, whether the
exception of treason, felony, or breach of the peace, being
stated in express terms, in these constitutions, it is to be un-
derstood strictly, and confined to cases coming within the
technical definition of these offenses, or whether it is used as a
compendious expression to denote all criminal cases of every
description. In favor of the latter opinion, it may be said,
first, there can be no doubt, that the framers of these constitu-
tions intended to secure the privilege in question upon as
reasonable and intelligible a foundation, as it existed by the
parliamentary and common law of England; in short, that as
in a multitude of other cases, they intended to adopt, with
the words, the full meaning which had been given to them by
usage and authoritative construction; and, second, that the
word *felony*, which alone gives rise to any doubt, 'has derived
so many meanings from so many parts of the common law, and
so many statutes in England, and has got to be used in such
a vast a number of different senses, that it is now impossible
to know precisely in what sense we are to understand it;' and,
consequently, that unless it is allowed to have such a significa-
tion, as with the other words of the exception, will cover the
whole extent of criminal matters, it must be rejected altogether
for uncertainty, or, at least, restricted to a very few cases.
These reasons, alone, though others might be added, are
sufficient to establish the point, that the terms 'treason, felony,
and breach of the peace,' as used in our constitutions, embrace

all criminal cases and proceedings whatsoever. In the Federal Government, therefore, and in the States above referred to, the privilege of exemption from legal process may be considered the same as it is in England."

Since from the foregoing it follows that the terms treason, felony and breach of the peace, as used in the constitutional provision relied upon, excepts from the operation of the privilege all criminal offenses, the conclusion results that the claim of privilege of exemption from arrest and sentence was without merit, and we are thus brought to consider the other assignments of error relied upon. They are, all but one, based on exceptions challenging the sufficiency of the indictment, and alleging the commission of material error in admitting and rejecting evidence, in refusing requested instructions and in the instructions given. The only assignment not based upon an exception taken at the trial asserts that it is so clearly shown by the record that there is no proof tending to establish the commission of the offense charged that it should be now so decided, even although no request to instruct the jury on that subject was made at the trial.

1. *As to the sufficiency of the indictment.*

With great elaboration it is insisted in argument that the indictment charges no crime, since there can be no such thing as a conspiracy to commit the offense of subornation of perjury. While the statutes of the United States cause every person who procures another to commit perjury to be guilty of subornation of perjury, it is said there is no punishment by statute, as at common law, for a mere attempt by an individual to induce the commission of perjury. This being so, the argument is that a charge of conspiracy to suborn, etc., perjury is in the nature of things but a charge of an attempt to suborn perjury, which amounts only to the charge of a conspiracy to do an act which is not a criminal offense. But the proposition wholly fails to give effect to the provisions of the conspiracy statute (Rev. Stat., § 5440), which clearly renders it criminal for two or more persons to conspire to commit any offense against the Uni-

ted States, provided only that one or more of the parties to the conspiracy do an act towards effecting the object of the conspiracy. In other words, although it be conceded, merely for the sake of argument, that an attempt by one person to suborn another to commit perjury may not be punishable under the criminal laws of the United States, it does not follow that a conspiracy by two or more persons to procure the commission of perjury, which embraces an unsuccessful attempt, is not a crime punishable as above stated. The conspiracy is the offense which the statute defines without reference to whether the crime which the conspirators have conspired to commit is consummated. And this result of the conspiracy statute also disposes of an elaborate argument concerning the alleged impossibility of framing an indictment charging a conspiracy to suborn perjury, since it rests upon the assumption that as the conspirators could not, in advance, know when they entered into the conspiracy that the persons would willfully swear falsely to what they and the conspirators knew to be false, there could be no conspiracy to suborn.

But even on the supposition that a valid indictment may be framed charging a conspiracy to commit subornation of perjury, the indictment in question, it is urged, is fatally defective by reason of an omission to directly particularize various elements, claimed to be essential to constitute the offense of perjury and other elements necessary to be averred in respect of the alleged suborners.

This is based upon the assumption that an indictment alleging a conspiracy to suborn perjury must describe not only the conspiracy relied upon, but also must, with technical precision, state all the elements essential to the commission of the crimes of subornation of perjury and perjury, which it is alleged is not done in the indictment under consideration. But in a charge of conspiracy the conspiracy is the gist of the crime, and certainty, to a common intent, sufficient to identify the offense which the defendants conspired to commit, is all that is requisite in stating the object of the conspiracy. Looking at the indict-

ment, it in terms charges an unlawful conspiracy and combination to have been entered into on a date and at a place named within the district where the indictment was found, and the object of the conspiracy is stated to be the suborning of a large number of persons to go before a named person, stated to be a United States Commissioner of the District of Oregon, and in proceedings for the entry and purchase of land in such district under the timber and stone acts, make oath before the official that the lands "were not being purchased by them on speculation, but were being purchased in good faith to be appropriated to the own exclusive use and benefit of those persons, respectively, and that they had not directly or indirectly made any agreement, or contract in any way or manner, with any other person or persons whomsoever, by which the titles which they might acquire from the said United States in and to such lands should inure in whole or in part to the benefit of any person except themselves, when, in truth and in fact, as each of the said persons would then well know, and as they, the said John Newton Williamson, Van Gesner, and Marion R. Biggs, would then well know, such persons would be applying to purchase such lands on speculation, and not in good faith, appropriate such lands to their own exclusive use and benefit respectively, and would have made agreements and contracts with them, the said John Newton Williamson, Van Gesner, and Marion R. Biggs, by which the titles which they might acquire from the said United States in such lands would inure to the benefit of the said John Newton Williamson and Van Gesner, then and before then engaged in the business of sheep raising in said county; the matters so to be stated, subscribed, and sworn by the said persons being material matters under the circumstances, and matters which the said persons so to be suborned, instigated, and procured, and the said John Newton Williamson, Van Gesner, and Marion R. Biggs would not believe to be true; and the said Marion R. Biggs, United States Commissioner as aforesaid, when administering such oaths to those persons, being an officer and person authorized by law

of the said United States to administer the said oaths, and the said oaths being oaths administered in cases where a law of the said United States would then authorize an oath to be administered."

These allegations plainly import, and they are susceptible of no other construction, than that the unlawful agreement contemplated a future solicitation of individuals to enter lands, who in so doing would necessarily knowingly state and subscribe under oath material false statements as to their purpose in respect to entering the land, etc., and known to be such by the conspirators. There is no reason to infer that the details of the unlawful conspiracy and agreement are not fully stated in the indictment, and it may, therefore, be assumed that the persons who were to be suborned, and the time and place of such subornation, had not been determined at the time of the conspiracy, except as might be inferred from a purpose to procure the persons to be suborned to come before the United States Commissioner for the District of Oregon named in an indictment. It was not essential to the commission of the crime that in the minds of the conspirators the precise persons to be suborned, or the time and place of such suborning, should have been agreed upon, and as the criminality of the conspiracy charged consisted in the unlawful agreement to compass a criminal purpose, the indictment, we think, sufficiently set forth such purpose. The assignments of error which assailed the sufficiency of the indictment are, therefore, without merit.

2. Numerous exceptions were taken, *a*, to the admission of evidence as to the understanding of the applicants concerning their arrangement with Gesner, one of the accused, and the purpose of the applicants in applying for the land; *b*, to the admission of the final proofs, which embraced a sworn statement, made pursuant to the requirements of a regulation adopted by the Commissioner of the General Land Office declaring the *bona fides* of the applicant, and that at that period he had made no contract or agreement to dispose of the land;

and, *c*, to evidence respecting the character of the land and concerning an attempt to acquire, and the acquisition by like wrongful methods of state school lands located near the Government timber lands in question.

As we shall hereafter have occasion to consider the instructions of the court concerning the scope of the indictment as to the final proofs and the law applicable to that subject, we put out of view for the moment the objections just mentioned, under subdivision *b*, relating to the final proofs and the intention of the applicants in respect to the land, at the time such final proof was made, and therefore presently consider the objections in so far only as they concern the other subjects.

The issue being the existence of a conspiracy to suborn various persons to commit perjury in relation to declarations to be made under the timber and stone act as to the purpose for which they desired to acquire land, etc., and as it is conceded that no formal contracts were executed between the alleged conspirators and the proposed entrymen, and the alleged understandings were of an ambiguous nature, and proof of the conspiracy depended upon a variety of circumstances going to show motive or intent, we think it was proper to permit the interrogation of the entrymen concerning their understanding of the arrangement with Gesner and their intention at the time when they made their preliminary declarations, as the testimony was relevant to the question of the nature and character of the dealings of the entrymen with the alleged conspirators, and bore on the question of the purpose or motive which influenced the making of the sworn statement required by law as a condition precedent to the purchase of the land. As it was insisted that the motive which impelled the formation of the conspiracy was the desire to acquire a large tract of land for sheep-grazing purposes, which acquisition had become necessary by reason of the fact that a rival had obtained a leasehold interest in a considerable portion of the land which Gesner and Williamson had theretofore used in their sheep-

raising business, we think the testimony as to the character of the timber lands in respect to suitability for grazing purposes, etc., and an attempt to acquire and the acquisition of state school lands was, we think, also competent as tending to establish on the part of the conspirator guilty intent, purpose, design or knowledge.

The contention that the proof on the subjects just stated should not have been admitted, because it tended to show the commission of crimes other than those charged in the indictment, and consequently must have operated to prejudice the accused, is, we think, without merit, particularly as the trial judge, in his charge to the jury, carefully limited the application of the testimony so as to prevent any improper use thereof.

The conclusion above expressed as to the admissibility of the evidence objected to is elucidated by *Holmes* v. *Goldsmith,* 147 U. S. 150, 164, where it was said:

"As has been frequently said, great latitude is allowed in the reception of circumstantial evidence, the aid of which is constantly required, and, therefore, where direct evidence of the fact is wanting, the more the jury can see of the surrounding facts and circumstances the more correct their judgment is likely to be. 'The competency of a collateral fact to be used as the basis of legitimate argument is not to be determined by the conclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if these may tend, even in a slight degree, to elucidate the inquiry, or to assist, though remotely, to a determination probably founded in truth.'

"The modern tendency, both of legislation and of the decision of courts, is to give as wide a scope as possible to the investigation of facts. Courts of error are especially unwilling to reverse cases because unimportant and possibly irrelevant testimony may have crept in, unless there is reason to think that practical injustice has been thereby caused."

3. The remaining assignments relate to the refusal to give

requested instructions and to portions of the charge of the court. Many of the requested instructions, however, are so clearly without merit, because in effect covered by the charge as given that we do not deem it necessary to particularly notice them. The only subjects which we think are sufficiently important to require express notice are:

a. That, even although no request was made to instruct the jury on the whole evidence to render a verdict of not guilty, nevertheless it should now be held that the record establishes such an entire absence of proof tending to show guilt that it should be so declared.

b. That prejudicial error was committed by the trial court in refusing requested instructions to the effect that the jury should acquit if they found that the defendants acted in good faith under the advice of counsel and in the belief of the law-fulness of their conduct.

c. Exceptions in respect to the instruction given by the court that the indictment covered perjury in the matter of the final proofs, and in instructing the jury that they might convict if satisfied by the evidence, beyond a reasonable doubt, that the defendants intended that the persons who might be procured or induced to make entries of lands should willfully and deliberately commit perjury in particulars stated at the time of making their depositions or sworn statements when they made their final proofs before the United States Commissioner, and in effect charging that a sworn statement made at the time of final proof concerning the purpose for which the land was sought to be purchased, etc., would constitute perjury if the oath so taken, although not expressly embraced in the statute, was required by a regulation of the Commissioner of the General Land Office, because such regulation had the force and effect of law. We shall consider the propositions *seriatim*.

a. Whilst it has been settled that in a criminal case where it plainly appeared that there was no evidence whatever justifying conviction, this court would so hold, despite the

failure to request an instruction of acquittal (*Wiborg* v. *United States,* 163 U. S. 632; *Clyatt* v. *United States,* 197 U. S. 207), this case affords no occasion for applying the rule, because it is not certified that the bill of exceptions contains the entire evidence, and we are not otherwise satisfied that it does, and further, because it is recited in the bill of exceptions that "the plaintiff offered evidence during said trial sufficient to go to the jury tending to prove each and every material allegation of the indictment."

*b.* Without attempting to review in detail the requested charges concerning motive and intent and the effect of advice of counsel, we think the trial judge in instructing the jury on the subject went as far in favor of the accused as it was possible for him to go consistently with right, and therefore there is no ground for complaint as to the failure to give the requested charges. The court, after having fully and carefully instructed the jury as to the operative effect of good faith in relieving the defendants from the charge made against them, in express terms noticed the question of the advice of counsel and said:

"Having now placed before you the timber and stone law and what it denounces, and what it permits, if a man honestly and in good faith seeks advice of a lawyer as to what he may lawfully do in the matter of loaning money to applicants under it, and fully and honestly lays all the facts before his counsel, and in good faith and honestly follows such advice, relying upon it and believing it to be correct, and only intends that his acts shall be lawful, he could not be convicted of crime which involves willful and unlawful intent; even if such advice were an inaccurate construction of the law. But, on the other hand, no man can willfully and knowingly violate the law and excuse himself from the consequences thereof by pleading that he followed the advice of counsel."

*c.* As the contentions under this head concern the instructions of the court in relation to the final proof and the effect of the regulations of the Commissioner of the General Land

Office relative to the subject, the exceptions taken to the charge in relation to the matter are in the margin.[1]

Further, as in order to dispose of these objections, it be-

---

[1] The defendants, each of them, also excepted to the giving of said instruction hereinbefore set forth, reading as follows: "Now, when the sworn statement is filed, the register posts a notice of the application, embracing a description of the land, in his office for a period of sixty days and furnishes the applicant a copy of the same for publication in a newspaper published nearest the location of the premises, for a like period of time. And it is provided by law, and by regulation duly made by proper authority and having the force and effect of law, that, after the expiration of said sixty days, the person or claimant desiring to purchase shall furnish to the register of the land office satisfactory evidence, among other things, that notice of the application prepared by the register was duly published in a newspaper as required by the law; that the land is of the character contemplated in the act; that the applicant has not sold or transferred his claim to the land since making his sworn statement, and has not, directly or indirectly, made any agreement or contract, in any way or manner, with any person whomsoever, by which the title he may acquire from the Government may inure, in whole or in part, to the benefit of any person except himself, and that he makes his entry in good faith for the appropriation of the land exclusively for his own use and not for the use and benefit of any other person; " as not the law and misleading and directing the attention of the jury to a matter not charged in the indictment.

Defendants, each of them, also then and there excepted to the giving of said instruction as hereinbefore set forth, reading as follows: "But, as heretofore said, if he is not in good faith and has directly or indirectly made any agreement or contract in any way or manner with any persons by which the title he may acquire from the United States shall inure in whole or in part to the benefit of any persons except himself, then he commits perjury in making his sworn statement, and in making a deposition that he has not done those things, and any person who knowingly and willfully procures and instigates the person to make such sworn statement or deposition is guilty of subornation of perjury," and especially to the words in said paragraph, "and in making a deposition that he has not done those things," upon the ground that the same is not the law and misleading and directs the attention of the jury to a matter not charged in the indictment.

Defendants also except to the giving of the instruction hereinbefore set forth, which reads as follows: "The essential questions, then, for your determination are, does the evidence show, beyond a reasonable doubt, that Williamson, Gesner and Biggs, or two of them, knowingly and intentionally entered into an agreement or combination to induce or procure persons to apply to purchase and enter the lands as alleged, or some part of the lands charged in the indictment, as lands subject to entry under the timber and stone act, after having first come to an agreement or under-

comes necessary to consider not only the scope of the indictment, but moreover to construe the Timber and Stone Act, and, it may be, to determine the validity of the regulation of the General Land Office heretofore referred to, the material portions of the act are in the margin,[1] as well as the regulation in question.

standing with such persons that they would convey the title which they might acquire to Williamson and Gesner, or either of them, and, next, does the evidence satisfy you beyond a reasonable doubt that these defendants, so combining and agreeing, intended that the persons, or some of the persons, whom they might procure or induce to make such entries should willfully and deliberately, in making their sworn statements or applications to purchase such lands at the time of making the first paper called a sworn statement or at the time of making their depositions or sworn statements when they made their final proofs before the United States Commissioner on applying to purchase such lands, commit perjury by swearing falsely that their applications were not made on speculation, but in good faith to appropriate the lands to the exclusive use and benefit of the applicant or applicants, and that the applicant or applicants had not, directly or indirectly, made any agreement or contract in any way or manner by which the title to be acquired from the United States should inure in whole or in part to the benefit of any persons other than himself or herself," and especially to the words therein "or some of the persons," and also to the words "or at the time of making their depositions or sworn statements when they made their final proofs before the United States Commissioner," as misleading and not the law and applying to a matter not charged in the indictment and variant from said indictment.

1 TIMBER AND STONE ACT.

(Approved June 3, 1878, 20 Stat. 89.)

CHAP. 151.—An Act for the sale of timber lands in the States of California, Oregon, Nevada, and in Washington Territory.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That surveyed public lands of the United States within the States of California, Oregon, and Nevada and in Washington Territory, not included within military, Indian, or other reservations of the United States, valuable chiefly for timber, but unfit for cultivation, and which have not been offered at public sale according to law, may be sold to citizens of the United States, or persons who have declared their intentions to become such, in quantities not exceeding one hundred and sixty acres to any one person or association of persons, at the minimum price of two dollars and fifty cents per acre; and lands valuable chiefly for stone may be sold on the same terms as timber lands: *Provided,* That nothing herein contained shall defeat or impair any *bona fide* claim under any law of the United States, or authorize the sale of any mining claim, or the

Contenting ourselves with referring to the quotation already made from the indictment, we are of opinion that the particular false swearing to which the indictment related was alone the

---

improvements of any *bona fide* settler, or lands containing gold, silver, cinnabar, copper, or coal, or lands selected by the said States under any law of the United States donating lands for internal improvements, education or other purposes: *And provided further,* That none of the rights conferred by the act approved July twenty-sixth, eighteen hundred and sixty-six, entitled "An act granting the right of way to ditch and canal owners over the public lands, and for other purposes," shall be abrogated by this act; and all patents granted shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under and by the provisions of said act; and such rights shall be expressly reserved in any patent issued under this act.

SEC. 2. That any person desiring to avail himself of the provisions of this act shall file with the register of the proper district a written statement in duplicate, one of which is to be transmitted to the General Land Office, designating by legal subdivisions the particular tract of land he desires to purchase, setting forth that the same is unfit for cultivation, and valuable chiefly for its timber or stone; that it is uninhabited; contains no mining or other improvements, except for ditch or canal purposes, where any such do exist, save such as were made by or belong to the applicant, nor, as deponent verily believes, any deposit of gold, silver, cinnabar, copper, or coal; that deponent has made no other application under this act; that he does not apply to purchase the same on speculation, but in good faith to appropriate it to his own exclusive use and benefit; and that he has not, directly or indirectly, made any agreement or contract, in any way or manner, with any person or persons whatsoever, by which the title which he might acquire from the Government of the United States should inure, in whole or in part, to the benefit of any person except himself; which statement must be verified by the oath of the applicant before the register or the receiver of the land office within the district where the land is situated; and if any person taking such oath shall swear falsely in the premises, he shall be subject to all the pains and penalties of perjury, and shall forfeit the money which he may have paid for said lands, and all right and title to the same; and any grant or conveyance which he may have made, except in the hands of *bona fide* purchasers, shall be null and void.

SEC. 3. That upon the filing of said statement, as provided in the second section of this act, the register of the land office shall post a notice of such application, embracing a description of the land by legal subdivisions, in his office, for a period of sixty days, and shall furnish the applicant a copy of the same for publication, at the expense of such applicant, in a newspaper published nearest the location of the premises, for a like period of time; and after the expiration of said sixty days, if no adverse claim shall have

verified written statement provided for in § 2 of the act to be
made on applying to purchase the land, and therefore the in-
dictment did not embrace a charge concerning a statement

been filed, the person desiring to purchase shall furnish to the register of
the land office satisfactory evidence, first, that said notice of the applica-
tion prepared by the register as aforesaid was duly published in a news-
paper as herein required; secondly, that the land is of the character con-
templated in this act, unoccupied and without improvements, other than
those excepted, either mining or agricultural, and that it apparently con-
tains no valuable deposits of gold, silver, cinnabar, copper, or coal; and
upon payment to the proper officer of the purchase money of said land,
together with the fees of the register and the receiver, as provided for in
case of mining claims in the twelfth section of the act approved May tenth,
eighteen hundred and seventy-two, the applicant may be permitted to enter
said tract, and, on the transmission to the General Land Office of the papers
and testimony in the case, a patent shall issue thereon: *Provided*, That
any person having a valid claim to any portion of the land may object,
in writing, to the issuance of a patent to lands so held by him, stating the
nature of his claim thereto; and evidence shall be taken, and the merits of
said objection shall be determined by the officers of the land office, sub-
ject to appeal, as in other land cases. Effect shall be given to the fore-
going provisions of this act by regulations to be prescribed by the Com-
missioner of the General Land Office.

\*       \*       \*       \*       \*       \*       \*       \*

Circular from the General Land Office Showing the Manner of Proceed-
ing to Obtain Title to Public Lands under the Homestead, Desert Land,
and Other Laws, issued July 11, 1899, p. 46:

"11. The evidence to be furnished to the satisfaction of the register and
receiver at time of entry, as required by the third section of the act, must
be taken before the register and receiver, and will consist of the testimony
of claimant, corroborated by the testimony of two disinterested witnesses.
The testimony will be reduced to writing by the register and receiver upon
the blanks provided for the purpose, after verbally propounding the ques-
tions set forth in the printed forms. The accuracy of affiant's information
and the *bona fides* of the entry must be tested by close and sufficient oral
examination. The register and receiver will especially direct such examina-
tion to ascertain whether the entry is made in good faith for the appropria-
tion of the land to the entryman's own use and not for sale or speculation,
and whether he has conveyed the land or his right thereto, or agreed to
make any such conveyance, or whether he has directly or indirectly entered
into any contract or agreement in any manner with any person or persons
whomsoever by which the title that may be acquired by the entry shall
inure, in whole or in part, to the benefit of any person or persons except
himself. They will certify to the fact of such oral examination, its suffi-
ciency, and his satisfaction therewith."

or deposition under oath required to be·made by any regula-
tion of the Commissioner of the General Land Office, after the
publication of the notice, and when the period had arrived for
final action by the land office on the application to purchase.
It seems to us clear that the indictment was thus restricted,
since all the language in it speaks as of the time of the first
statement, no reference is made to any regulation of the Com-
missioner supplementing the statute in any particular, and
each of the nineteen overt acts charged to have been com-
mitted exclusively relates to the statement required by § 2,
and to none other.    We are of opinion that the elaborate
argument made by the Government concerning the use in the
indictment of the words, declarations and depositions can
serve only to suggest ambiguity in the indictment, and possible
doubt as to the meaning of the pleader. · But, as of course, in
a criminal case, doubt must be resolved in favor of the ac-
cused, we hold that the indictment does not charge a con-
spiracy to suborn perjury in respect of the making of the final
proofs, and therefore that there was prejudicial error com-
mitted in the instructions to the jury on that subject which
were excepted to.

As, however, the question which we have hitherto passed
over concerning the admissibility of the final proof to show
motive in making the original application may arise at a future
trial, even although it be that the indictment charges only a
conspiracy to suborn perjury as to the original application,
we proceed to consider that subject.    To do so it becomes nec-
essary to determine whether the statute requires an applicant,
after he has made his preliminary sworn statement concerning
the *bona fides* of his application and the absence of any con-
tract or agreement in respect to the title, to additionally swear
to such facts after notice of his application has been published
and the time has arrived for final action on the application.
And this of course involves deciding whether the regulation
of the Commissioner exacting such additional statement at the
time of final hearing is valid.    The inquiry concerns only the

second and third sections of the act. Turning to the second section, it will be seen that it requires the applicant to make a sworn statement, giving many particulars concerning the land—its unfitness for cultivation; its being uninhabited; the absence of mineral, etc.,—followed by the requirement that the applicant shall declare that he makes the application, not for the purpose of speculation, but in good faith, and that he intends to appropriate the land to his own exclusive use and benefit and that no agreement has been made, directly or indirectly, with any person or persons whatsoever by which the title to be acquired from the Government shall inure, in whole or in part, to any person except the applicant. And the section concludes by causing any false statement made in the sworn application to constitute the crime of perjury. Examining the third section, it will be seen that it provides that upon the filing of said statement, as provided in the second section, it shall be the duty of the local land officer to post a notice of the application in his office for sixty days, to furnish the applicant with a copy of such notice for publication, at the expense of the applicant, in the nearest newspaper for sixty days, and when such period has expired, on proof of the publication and of certain facts, which the statute expressly enumerates, the applicant shall, upon payment of the requisite charge, in the absence of a contest, be entitled to a patent for the land. Examining the items, which the statute requires the applicant to make proof of, after showing publication, it is apparent that while some of the things referred to in the prior section, and which are required to be stated in the preliminary proof are reiterated, all requirement is omitted of any statement regarding a speculative purpose on the part of the applicant, his *bona fides*, and his intention to acquire for himself alone. When the context of the statute is thus brought into view we are of the opinion that it cannot possibly be held, without making by judicial legislation a new law, that the statute exacts from the applicant a reiteration, at the final hearing, of the declaration concerning his purpose in acquiring

title to the land, since to do so would be to construe the statute as including in the final hearing that which the very terms of the statute manifests were intended to be excluded therefrom. We say this, because as the third section reëxacts in the final application a reiteration of some of the requirements concerning the character of the land made necessary in the first application and omits the requirement as to the *bona fides*, etc., of the applicant, it follows under the elementary rule that the inclusion of one is the exclusion of the other, that the reexacting of a portion only of the requirements was equivalent to an express declaration by Congress that the remaining requirements should not be exacted at the final proof. And this becomes particularly cogent when the briefness of the act is considered, when the propinquity of the two provisions is borne in mind, a propinquity which excludes the conception that the legislative mind could possibly have overlooked in one section the provisions of a section immediately preceding, especially when in the last section some of the requirements of the prior section are reëxpressed and made applicable to the final statement. Indeed, we cannot perceive how, under the statute, if an applicant has in good faith complied with the requirements of the second section of the act, and pending the publication of notice, has contracted to convey, after patent, his rights in the land, his so doing could operate to forfeit his right. These conclusions are directly sustained by a recent ruling in *Adams* v. *Church*, 193 U. S. 510, construing the timber culture act. Under that law an applicant for entry was obliged, among other things, in making his application to swear to his good faith and to the absence of speculative purpose, in the exact words of the statute now under consideration. But in the timber culture act, as in the timber and stone act, the requirement was not reimposed in respect to the final proof. In the cited case the entryman who had complied with the statute in making his application had, between the date of the application and the making of final proof, disposed of his right, and the question was whether by so doing he had for-

feited his claim. In deciding adversely to the contention that he had the court said (p. 516):

"But as the law does not require affidavit before final certificate that no interest in the land has been sold, we perceive no reason why such contract, as was found to exist by the Supreme Court of Oregon, would vitiate the agreement to convey after the certificate is granted and the patent issued. If the entryman has complied with the statute and made the entry in good faith, in accordance with the terms of the law and the oath required of him upon making such entry, and has done nothing inconsistent with the terms of the law, we find nothing in the fact that, during his term of occupancy, he has agreed to convey an interest to be conveyed after patent issued, which will defeat his claim and forfeit the right acquired by planting the trees and complying with the terms of the law. Had Congress intended such result to follow from the alienation of an interest after entry in good faith it would have so declared in the law. *Myers* v. *Croft,* 13 Wall. 291."

It is elaborately insisted on behalf of the Government that there is a difference between the timber culture act and the timber and stone act, resulting from the fact that in the one case in the interim between the entry and the final proof a long time must elapse and much is required to be done by the applicant, while in the other a short time intervenes and substantially nothing is required to be done. But this reasoning, in effect, assails the wisdom of Congress in omitting the requirement in the act under consideration and affords no ground for inserting in the act requirements which Congress has, by express intendment, excluded therefrom. Besides, the weakness of the argument becomes apparent when it is borne in mind that the timber and stone act and the timber culture act were enacted by the same Congress and with only a few days' interval between the two.

It remains only to consider whether it was within the power of the Commissioner of the General Land Office to enact rules and regulations by which an entryman would be compelled

to do that at the final hearing which the act of Congress must be considered as having expressly excluded in order thereby to deprive the entryman of a right which the act by necessary implication conferred upon him. To state the question is to answer it. As observed in *Adams* v. *Church, supra*, at p. 517: "To sustain the contention . . . would be to incorporate . . . a prohibition against the alienation of an interest in the lands, not found in the statute or required by the policy of the law upon the subject." True it is that in the concluding portion of § 3 of the timber and stone act it is provided that "effect shall be given to the foregoing provisions of this act by regulations to be prescribed by the Commissioner of the General Land Office." But this power must in the nature of things be construed as authorizing the Commissioner of the General Land Office to adopt rules and regulations for the enforcement of the statute, and cannot be held to have authorized him, by such an exercise of power, to virtually adopt rules and regulations destructive of rights which Congress had conferred. As then there was no requirement concerning the making in the final proof of an affidavit as to the particulars referred to, and as the entryman who had complied with the preliminary requirements was under no obligation to make such an affidavit and had full power to dispose *ad interim* of his claim upon the final issue of patent, we think the motive of the applicant at the time of the final proof was irrelevant, even under the broad rule which we have previously in this case applied, and therefore that error was committed not alone in instructing the jury that the indictment covered or could cover the procurement of perjury in connection with the final proof, and that the jury might base a conviction thereon, but in admitting the final proof as evidence tending to show the alleged illegal purpose in the primary application for the purchase of the lands.

*Reversed and remanded.*

MR. JUSTICE HARLAN is of opinion that no substantial error was committed, and the judgment should be affirmed.