## DICKINSON v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. February 12, 1908.)

No. 681.

**1.** BANKS AND BANKING—NATIONAL BANKS—OFFENSES—CONVERSION OF FUNDS —INDICTMENT—"CONVERT."

An indictment alleging that F., as cashier of a national bank, unlawfully "converted" certain "moneys, funds, credit and credits" to the use of D. sufficiently charged the manner in which the misapplication was effected.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 6, Banks and Banking, § 973.

For other definitions, see Words and Phrases, vol. 2, p. 1570.]

**2.** CRIMINAL LAW—EVIDENCE—OBJECTIONS—REVIEW.

Where evidence of guilty knowledge was material and admissible under an assurance that it would be connected, its admissibilty could not be reviewed on a writ of error on objection taken at the trial that it was immaterial or remote, not sufficiently connected with defendants, or with the transactions complained of, etc., it being impossible to tell from the record whether it was connected or not.

**3.** BANKS AND BANKING—NATIONAL BANKS—OFFENSES—EVIDENCE.

In a prosecution for misappropriation of the funds of a national bank, a letter written by certain of the directors of the bank to the comptroller of the currency, after the misappropriation, was inadmissible either as showing the state of mind of the directors after the offense, or a ratification of the misappropriation.

**4.** JURY—RIGHT OF JURY TRIAL—NUMBER OF JURORS—WAIVER—MISDEMEANORS.

While a person accused of an infamous crime, though not a felony, may waive the disqualification of jurors, or even their impartiality, such person cannot waive his right to a trial by a jury of 12 by consenting, after a legal jury had been impaneled and two had been excused, to continue the trial and abide by the verdict of the remaining 10.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 31, Jury, §§ 197–203.]

Aldrich, District Judge, dissenting.

In Error to the District Court of the United States for the District of Massachusetts.

Henry W. Dunn (Powers & Hall, on the brief), for plaintiff in error.

Asa P. French, U. S. Atty. (Roscoe Walsworth, Special Asst. U. S. Atty., on the brief), and William H. Lewis, Asst. U. S. Atty.

Before PUTNAM, Circuit Judge, and ALDRICH and BROWN, District Judges.

PUTNAM, Circuit Judge. This was a joint indictment of Dickinson and one Foster, the latter of whom was cashier of the South Danvers National Bank, under section 5209 of the Revised Statutes. Foster and Dickinson were convicted on several counts, but not on the fourth and tenth. As Dickinson was entitled to do, he sued out this separate writ of error. The pith of the offense alleged against Dickinson was based on the fact that Foster, the cashier, was the principal offender, and that he, as such cashier, unlawfully "converted" certain "money, funds, credit and credits" to the use of Dickinson. The assets so converted were not otherwise described, except

that, in each count, the value was given in one round sum. Neither was there any further description of the method of conversion. Dickinson was indicted as aiding and abetting. Consequently, Dickinson could not be convicted under any count except as Foster was found guilty as principal.

The pith of the first error alleged is put in the following language:

"That each count of the indictment was vague and indefinite, and did not state with that reasonable certainty required by law the way in which the alleged misapplication was made."

We do not perceive that the general assertion that the various counts are vague is to be regarded by us except in that it is maintained that there is no description of the way in which the alleged misapplication was made. The plaintiff in error is misled by his own expression "alleged misapplication." If the word "misapplication" was all there was in the counts, they, of course, would be invalid in accordance with United States v. Britton, 107 U. S. 655, 669, 2 Sup. Ct. 512, 27 L. Ed. 520. There it was held that, in an indictment of this character, the words "willfully misapplied," without something to show the method of the misapplication, was insufficient. It did not need a decision of the Supreme Court to establish that proposition, because it represents a familiar rule in the criminal law. But, as we have said, it is alleged here that the assets were unlawfully converted to the use of Dickinson, so that the method of misapplication was shown. The word "convert" has such force at common law that, when used in an indictment, with a statement as to whose use the conversion was made, it needs no amplification, any more than the word "embezzle," or the words "steal, take and carry away." This we pointed out in Jewett v. United States, 100 Fed. 832, 837, 41 C. C. A. 88, 53 L. R. A. 568, decided by us on March 29, 1900.

The plaintiff in error relies on Batchelor v. United States, 156 U. S. 426, 427, 15 Sup. Ct. 446, 39 L. Ed. 478. That decision is not of much use as a precedent. The difficulty there was that there were long allegations of details, all connected by the words "in the manner following," and "in the manner aforesaid," and that the allegations taken as a whole the court could not understand. The only question was one of contradictory pleadings, arising from too much detail, rather than a lack of it as claimed by the plaintiff in error before us. It is quite likely that the pleadings in this case might have been criticised in some particulars not now urged, and that there might have been a variance shown at the trial. It is true that the word "converted" is also awkward in the place where we find it here; but no objection was attempted on that ground, and its use as used here has been accepted by the Supreme Court in a like connection and for the same purpose. Coffin v. United States, 156 U. S. 432, 435, 15 Sup. Ct. 394, 39 L. Ed. 481; 162 U. S. 666, 16 Sup. Ct. 943, 40 L. Ed. 1109. The word "convert," under the circumstances, must be accepted as intending exactly the same thing as when spoken in connection with the use of the person who was guilty of the conversion. So, also, the plaintiff in error has not relied on any variance, or any inadequacy of description of the assets which were misapplied, except with ref-

erence to the fourth and tenth counts, as to which he was acquitted. On the whole, the indictment, in the particular which we are now considering, is fully covered by our decision in Jewett v. United States, ubi supra.

As we have said, the plaintiff in error was charged with accepting the benefit of the misapplication of the assets of the bank by the cashier. This misapplication was by permitting overdrafts, and also by permitting the discount of various notes and the consequent drafts against the proceeds thereof, many of which notes ultimately involved the bank in serious loss. As the guilty intentions of Dickinson and Foster were involved, it would naturally be assumed that the United States would have sought to prove that they knew that some of these notes were worthless, or lacking sufficient assets behind them; but we are asked to consider objections to prove that Dickinson knew, or had reason to know, that such was the fact. The record shows that the court instructed the jury that the evidence of knowledge on the part of Dickinson would not affect Foster. The portion of the record thus referred to fails to observe whether the court charged that Dickinson's knowledge would not avail the United States unless the knowledge of Foster was also proven, as it should have done at some part of its charge. However, the following were the objections taken at the trial:

"The evidence in question had no sufficient legal bearing on the transactions complained of in the indictment or the issues properly involved in the trial thereof; the evidence was immaterial or remote; it was not sufficiently connected with the defendants; that it was not sufficiently connected with the transactions complained of in the indictment; it tended to complicate the issue, and to prejudice the jury."

These objections related to the testimony of numerous witnesses, in a sweeping form. We could have judged them more satisfactorily if exactly what occurred at the trial with reference to the particular evidence of any particular witness had been given us in a detailed, concrete form. The objection that the evidence had no sufficient legal bearing and was immaterial or remote, as a general proposition, certainly was not sound, because it was material to prove Dickinson's knowledge. That it tended to complicate the issue and prejudice the jury was, of course, ineffectual without explanation. All proofs may do those things. That it was not connected is not a proposition that we can consider on this record, where no statement was made to that effect. The proof was material and admissible under an assurance that it would be connected. If it was not connected, the plaintiff in error had his remedy, but not in the way in which it is now sought to be presented. For example, the topic might not be legitimate if it had appeared that the court had, on the subsequent application of the plaintiff in error, refused to instruct the jury as to the proper method of connecting the proof, or as to its ineffectiveness if not connected with Foster. As the record stands, the admission of the evidence may, or may not, have been error, and it is impossible for us to determine which was the fact.

We are also asked to pass on certain correspondence between the Comptroller of the Currency and some of the witnesses which occurred subsequently to the misapplication charged in the indictment. Some of the directors who were parties to the letter to the Comptroller thus offered in evidence testified for the United States. It is not necessary to detail this correspondence. If it was offered to contradict, it was admitted at our bar that the ground therefor had not been laid for its admission; if it was offered to show merely the state of mind of the directors after the offense had been committed, it was clearly of no consequence; and, if it was offered to show ratification and approval, the directors could neither ratify nor approve as against the United States what was an already completed criminal act. The truth is that, so far as appears, the correspondence was merely ex post facto, and, under the circumstances, immaterial; and it was properly ruled out.

The only remaining point is that, by the consent of both the United States and the plaintiff in error, the verdict was taken from 10 jurors, 2 having been excused. The facts were as follows:

The full jury of 12 was impaneled, and the trial commenced. While it was proceeding it appeared that one of the jurors, by reason of illness, was unable to sit further, whereupon the following agreement was filed of record:

"Whereas one of the jurors impaneled to try the above-entitled indictment is unable by reason of illness to further sit therein.

"Now, therefore, we consent and agree that the said juror, to wit, Charles F. Low, may be discharged from the further trial of this indictment, and that the trial now pending may proceed before the remaining eleven jurors with the same force and effect as if said juror had not been discharged.

"John W. Dickinson.
"George M. Foster.
"United States,
"By Boyd B. Jones,
"Special Assistant U. S. Attorney."

The court proceeded with the trial with the remaining 11 jurors. Subsequently, the trial being still unfinished, death occurred in the family of one of them, and another like agreement was filed of record as to him. The trial proceeded with the remaining 10 jurors, who returned a verdict, subsequently to which a motion in arrest of judgment was filed as follows, and overruled:

"And now, after verdict against the said John W. Dickinson, and before sentence, comes the said John W. Dickinson, by his attorneys, and moves the court here to arrest judgment herein and not pronounce the same, because of manifest errors in the record appearing, to wit: Because the said verdict against the said John W. Dickinson was found by a so-called jury consisting of ten (10) jurors only, and not by a jury of twelve (12) jurors, as required by the Constitution and laws of the United States, and because no judgment against him, the said John W. Dickinson, can be lawfully rendered on said verdict. Powers & Hall,
"Attorneys for the said Defendant."

It will be noticed that the trial commenced with the constitutional tribunal; that is, a court organized under the Constitution and laws of the United States, with authority to try the offense in question, and a judge of that court duly appointed and commissioned, and

authorized to preside at the trial, and a constitutional jury. The difficulty arose subsequently. We refer to these facts so that it may be understood that we do not overlook them, although neither party has made any distinction between a case where the full jury is first impaneled and jurors are subsequently withdrawn with consent of one, and where, with like consent, the jury was from the beginning deficient in numbers. We are not aware that any court or text-writer has ever made any distinction on this score, and we will not attempt one. The following are the constitutional provisions in question:

The second section of article 3, of the Constitution, reads:

"The trial of all crimes, except in cases of impeachment, shall be by jury; and such trial shall be held in the state where the said crime shall have been committed; but when not committed within any state, the trial shall be at such place or places as the Congress by law may have directed."

Amendment article 5 reads:

"No person shall be held to answer for a capital, or otherwise infamous crime, unless on the presentment or indictment of a grand jury, except," etc.; and no one "shall be compelled in any case to be a witness against himself."

Amendment article 6 reads:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence."

Amendment article 7 reads:

"In suits at common law, where the value in controversy shall exceed twenty dolllars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of the United States, than according to the rules of the common law."

It is settled that the offense in question before us is an infamous crime within the meaning of the Amendment article 5, though not a felony. Ex parte Wilson, 114 U. S. 417, 5 Sup. Ct. 935, 29 L. Ed. 89. It has also been repeatedly determined by the Supreme Court that, even when the phraseology of the Constitution is apparently unqualified, it may be construed with certain qualifications in the light of the principles of the common law, of which perhaps the most striking illustrations are Robertson v. Baldwin, 165 U. S. 275, 17 Sup. Ct. 326, 41 L. Ed. 715, and Capital Traction Company v. Hof, 174 U. S. 1, 19 Sup. Ct. 580, 43 L. Ed. 873. The latest is Williamson v. United States, 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. ——. There is no question that it was settled law in England that, in a case of felony, the jury panel could not be weakened by waiver of the person prosecuted. Thompson v. Utah, 170 U. S. 343, 353, 354, 18 Sup. Ct. 620, 42 L. Ed. 1061; Queenan v. Oklahoma, 190 U. S. 548, 551, 23 Sup. Ct. 762, 47 L. Ed. 1175. But with regard to misdemeanors, we have made a very diligent search, and find no pronounced practice prior to the Constitution in the English courts or elsewhere with reference to like waivers.

It is no doubt true that, within the states of Maine, Massachusetts, and New Hampshire, there has been to a certain extent practical recognition of the power in cases of misdemeanors to waive a full jury as the same was waived here; but apparently this was never formally approved until Commonwealth v. Dailey, 12 Cush. (Mass.) 80, decided in 1853. This practice, whatever it was, is not of such antiquity or universality as to affect the construction of the Constitution of the United States. In the absence of any historical guide, other state courts have arrayed themselves on different sides of the topic in numerous decisions, and under somewhat different constitutional forms of expression, and. to some extent without recognizing any distinction between felonies and such high crimes as are misdemeanors. This has gone so far that it will be of no avail for us to do more than cite two or three of the leading authorities, and explain our conclusions as briefly as we can. This is especially so in view of the fact that it is beyond our power to enter a judgment which involves finality, and it is also of little consequence what judicial results are reached until we have a determination of the Supreme Court directly on the issue, which determination we have never yet received.

It is plain that Amendments articles 5 and 6 are so expressed, and some of the elements to which they relate are of such a character that there may be waiver to a certain extent by an alleged criminal, at least with regard to misdemeanors; as, for example, the privilege as to criminating testimony, the right to a speedy trial, the right to compulsory process for witnesses, the right to the assistance of counsel for defense, and the right to be confronted by the witnesses. Others the accused cannot waive, as, for example, an indictment in the case of a capital or infamous crime, and a jury drawn from the district specified.

On the other hand, the provisions of section 2 of article 3 are peremptory in form, and point out absolutely the tribunal which must dispose of the crimes to which they refer. They cover nothing except what concerns the public interests, as well as personal liberty. The article in unqualified terms establishes the tribunal. Inasmuch as the public, as well as the persons charged, have always an interest in what tribunal shall dispose of prosecutions for high crimes, it would appear prima facie that no prosecuting officer nor any person accused, whether acting separately or by agreement, can substitute another locality or another tribunal for that which the letter of the Constitution designates.

The tribunal pointed out by article 3 consists of a jury, and, by necessary implication, of a court established under the Constitution and the laws, with a judge or judges appointed also according to the Constitution and the laws to preside therein. We have said that there is no authoritative determination with reference to the topic before us; but the jury to be impaneled for a criminal cause within the meaning of the Constitution has been directly and authoritatively determined in Thompson .v. Utah, 170 U. S. 343, 18 Sup. Ct. 620, 42 L. Ed. 1061, to consist of 12. With the aid of this determination, the third article points out perfectly the el-

ements of the tribunal authorized to proceed against persons accused of crimes like that before us, including equally the court, the judge and the jury, and the number composing the jury. Has any one other than the makers of the Constitution, or those authorized to amend it, the power to substitute for what is thus declared? No one has ever conceived an affirmative answer as to the court or judge; and the apparent answer as to the jury would also be in the negative.

To be sure, while the Constitution and the amendments make no literal distinction between a jury for criminal proceedings and a jury for civil proceedings, yet, with reference to bills of exceptions, writs of error, and everything else, the Supreme Court has accepted in civil proceedings verdicts of 9, 10 or 11 jurors as verdicts of constitutional juries; and the right of parties to waive the presence of one or more of the 12 in ordinary suits at common law is conceded. This, however, may be assigned to the fact that at common law the power to waive in civil suits was also conceded; and the authorities which we have cited establish the proposition that the Constitution and its amendments are to be construed in the light of that fact. Again, it is urged, and it is true, that the hardships which may sometimes occur, arising from circumstances like those at bar, in the event of a constitutional inhibition of waiver, may be of the most serious character, sometimes even involving financial ruin of the accused in compelling him to abandon the first trial and go through a new one; yet, on the other hand, it is urged that it may well be presumed that a person charged with crime acts under duress, so that his consent to waive the advantages which may come to him from insisting on the unanimous concurrence of 12 jurors instead of 10 or 11 ought not to be lightly accepted. Consequently, neither of these considerations presses with so much weight as to enable us to reach a determination of the question before us.

However, as we have said, we do not deem it of value to pursue the discussion throughout. We will put on the one side Chief Justice Shaw and the Supreme Judicial Court of Massachusetts as stating the right to waive, under circumstances as in the case at bar, in Commonwealth v. Dailey, 12 Cush. 80. On the other side, as sound a writer on constitutional law as we have had, Chief Justice Cooley, declared as follows:

"The infirmity in case of a trial by jury of less than twelve by consent would be that the tribunal would be one unknown to the law, created by mere voluntary act of the parties; and it would in effect be requiring to submit to a species of arbitration the question whether the accused has been guilty of an offense against the state." Cooley's Constitutional Limitations (7th Ed., 1903) 458, 459.

The learned jurist, in stating the direct proposition that a full panel could not be waived even by consent, adds: "At least in case of felony." But the principle he lays down covers every criminal proceeding where by the Constitution a common-law jury is required. What we have attributed to him is quoted from the seventh edition of his Constitutional Limitations, but the same will be found in the edition of

1896, which is the last published during his lifetime. Thus it appears that he reached the result stated at the end of 30 years' study and reflection. The reasoning which Chief Justice Cooley relied on as supporting the conclusion which we have attributed to him is undoubtedly found in Hill v. The People, 16 Mich. 351, 357, decided in 1868. There the opinion was given by Judge Christiancy, and was concurred in by all the other judges, including Chief Justice Cooley. The doctrine spoken of by Judge Christiancy would sustain the judgment in this case. He proceeded as follows:

"The doctrine rests upon assent; in other words, when reduced to its final analysis, upon contract. Under our Constitution, in civil cases, there can be no reasonable doubt of the competency of parties to waive such an objection, or to stipulate for a trial by jury of less than twelve, since they can waive the right of a jury trial altogether, and are held to have done so unless it is demanded. But a criminal prosecution, in which the people in their sovereign capacity prosecute for a crime against the laws of the whole society, and seek to subject the defendant to punishment, must, it seems to us, be considered as a proceeding in invitum, against the will of the defendant throughout, so far as relates to a question of this kind, or any question as to the legal constitution of the court or jury by which he is to be tried. It would be adding materially to the generally recognized force of the obligation of contracts to hold that a defendant charged with a crime might, without a trial, enter into a binding contract with the prosecuting attorney to go to the penitentiary for a certain number of years in satisfaction for the offense. And yet it would approximate such a position to hold that he might be bound by a contract providing for a trial before a court or jury unknown to the Constitution or the laws, the result of which trial might be to place him in the same penitentiary.

"The true theory, we think, is that the people, in their political or sovereign capacity, assume to provide by law the proper tribunals and modes of trial for offenses, without consulting the wishes of the defendant as such; and upon them, therefore, devolves the responsibility, not only of enacting such laws, but of carrying them into effect, by furnishing the tribunals, the panels of jurors, and other safeguards for his trial, in accordance with the constitution which secures his rights. The government, the officers of the law, bring the jurors into the box; he has no control over the matter, who shall be summoned or compose the panel, upon which he may exercise the right of challenge; and the prosecution must see that electors only are placed there, as the law requires." * * * "It is the duty of courts to see that the constitutional rights of a defendant in a criminal case shall not be violated, however negligent he may be in raising the objection. It is in such cases, emphatically, that consent should not be allowed to give jurisdiction."

The opinion of Chief Justice Shaw was based entirely on propositions initiated by himself, or by the court he represented. All the cases cited by him have been carefully examined, and they in no way meet the difficulty here; and he made no claim that they did. The conclusion he reached stood entirely on the force of his own reasoning, anl he halts when he reaches the following, on page 83 of 12 Cush. (Mass.):

"But it is asked, if consent will authorize a trial before eleven jurors, why not before ten or six, or one. It appears to us, that it is a good answer to say that no departure from established forms of trial in criminal cases can take place without permission of the judge, and no discreet judge would permit any such extravagant or wide departure from these salutary forms as the question supposes, nor any departure, unless upon some unforeseen or urgent exigency."

We have been unable to answer satisfactorily the question which he thus asked himself to determine, or to frame any satisfactory rule by which, if the waivers at bar can be sustained, the jury may not be made to consist of 1 man instead of 12. The legal mind involuntarily rejects a proposition that the jury might be so constituted constitutionally; and yet we are unable to determine at what point the weakening of the panel should stop unless it might by consent be reduced to a single individual. Chief Justice Shaw likewise finds no solution except the discretion of the judge; but, while, necessarily the discretion of the judge is often interposed in administering the civil law, and, to a certain extent, the criminal law, it seems wholly inappropriate that it should be availed of in a matter of so grave a character as the construction and practical application of the Constitution of the United States. We are not able to accept a proposition of that kind.

We have referred impliedly to the fact that the rule of the Supreme Court is that, ordinarily, the federal courts in any district may follow the settled practice in criminal cases in the state which includes the district in existence at the time the Constitution was adopted. While this rule may not go so far as to control directly the construction of the Constitution, nevertheless, it cannot be questioned that if, as shown historically, there had been, at the common law, or even in Massachusetts before the Constitution, a practice of excusing jurors in misdemeanors, this would have weight under Robertson v. Baldwin, 165 U. S. 275, 17 Sup. Ct. 326, 41 L. Ed. 715, Capital Traction Company v. Hof, 174 U. S. 1, 19 Sup. Ct. 580, 43 L. Ed. 873, and Williamson v. United States, 207 U. S. 425, 28 Sup. Ct. 162, 52 L. Ed. ——, already cited, as such ancient practices have with regard to waiving the disqualification of jurors, and even their impartiality, at least in trials for misdemeanors. For the traditional law of New England we look to Dane's Abridgment, where we are unable to find any trace of a practice supporting the proceedings now in review before us; and Chief Justice Shaw, who certainly would have known of such a practice if there had been any, in no degree rested Commonwealth v. Dailey on any assumption of that nature.

Of course, the fact to which we have referred is pressed on us, that the right to waive the disqualification of jurors, and even impartiality, is conceded, although the amendments guarantee an "impartial jury." This, however, is disposed of by the fact which we have explained, that the Constitution is construed in the light of the settled practice of the common law. At the common law it had always been held that such waivers, when permitted, did not constitute error. The precise distinction was made in Queenan v. Oklahoma, 190 U. S. 548, 551, 23 Sup. Ct. 762, 47 L. Ed. 1175. There the matter was directly in issue on an indictment for murder, and, as the case came from a territorial court, it involved the Constitution of the United States. It appeared that, in the course of the trial, the United States announced that, since an adjournment, it had been informed that one of the jurors had been convicted of an offense which, by the local law, was felony; and they gave full information in reference thereto. The opinion observes that

the territorial court assumed that, for the then purposes, this disqualified the juror from serving; and it continues as follows:

"The court asked the counsel for the prisoner what they desired to do, and its intimation indicated that, if the objection were pressed, the juror would be excused. This, of course, meant that the trial would have to be begun over again. The counsel for the prisoner answered that they had nothing to say, and the trial went on. It is now argued that the defendant was deprived of a constitutional right which he could not waive. Thompson v. Utah, 170 U. S. 343, 18 Sup. Ct. 620, 42 L. Ed. 1061. The contrary plainly is the law, as well for the territories as for the states."

This statement that, if the juror had been excused, the trial would have had to be begun over again makes an authoritative determination of a distinction which applies as much to misdemeanors as to felonies, to the effect that it does not follow that, because objections to the qualifications of jurors can be waived, a reduction in their number can also be waived. Therefore, so far as this point is concerned, the United States can take no advantage.

Of course, it would yield no results for us to attempt to go over to any substantial extent the history of trial by jury, which so many learned writers have undertaken to explain with more or less success. Therefore, we will refer to only two evidences showing how rigid was the common law so far as applicable here. Lord Dacre's Case was explained in Kelyng's Reports, 56. Kelyng showed the authority for his statements. He said it was ruled unanimously by the judges who had been summoned in to the House of Lords, that Lord Dacre could not waive his trial by his peers and be tried by the country; and, also, that, although all the peers did not agree in their verdict, it would still be a good verdict "so that there be twelve or more." He added:

"Therefore, the use is never to have less than twenty-three peers for tryers, because that is the least number to be sure that twelve be of one mind."

So in Forsyth's History of Trial by Jury, 241, it is stated that it was decided in the reign of Edward the Third that "a verdict by less than twelve" was a nullity. Authorities for this are cited. Lord Dacre's Case was, of course, a felony, and perhaps neither of the citations are directly in point here; but they show that the common law sought to secure, not merely a jury of 12, but the concurrence of that number. Reasons for this of a very special character have been often suggested.

We fully appreciate the urgent arguments to the contrary of our propositions; but, in view of the insufficient status of judicial decisions, we do not feel that we are permitted to qualify the situation. Of course, this conclusion has no relation to minor offenses of the class covered by Schick v. United States, 195 U. S. 65, 24 Sup. Ct. 826, 49 L. Ed. 99; but it applies to high misdemeanors of the character at bar.

The United States press on us that the Amendments articles 5 and 6 modify, on the question we are considering, article 3 of the Constitution as originally adopted. We find no authority in support of this proposition. The amendments, as we have said, touch some mat-

ters which, by their very nature, are of such a character that a person accused may waive them. They also include other matters which, by their very nature, cannot be waived; as, for example, the requirement of an investigation by a grand jury with regard to infamous crimes seems to be settled in Callan v. Wilson, 127 U. S. 540, 8 Sup. Ct. 1301, 32 L. Ed. 223. This requirement, like those of article 3 directing a jury and fixing the place of trial, relates to the frame of government, and therefore it is not subject to the control of the parties. The only expressions we find in the decisions of the Supreme Court relating to this subtopic are in Schick v. United States, 195 U. S. 65, 68, 24 Sup. Ct. 826, 49 L. Ed. 99, and in Callan v. Wilson, at page 549 of 127 U. S., 8 Sup. Ct. 1301, 32 L. Ed. 223. Schick v. United States determines nothing, because it merely says that, "if there be any conflict" between the amendments to the Constitution as originally adopted, "the amendments must control" under the well-understood rule that "the last expression of the will of the lawmaker prevails." On the other hand, the opinion in Callan v. Wilson states definitively that "there is no necessary conflict."

The observations in the opinions of the Supreme Court seem to be in complete harmony with the generally accepted rule, to the effect that, while the original Constitution relates to the frame of government, the amendments are in the nature of a "Bill of Rights," which, of course, is understood to be in the interest of the citizen or subject, and, therefore, prima facie, more or less under his control and subject to waiver. The amendments are described in the first edition of Story's Commentaries on the Constitution, § 1776, and in the third edition of the same work at sections 303 and 1857, and in Cooley's Constitutional Limitations (7th Ed.) at page 365, as a "Bill of Rights." Story points out that the Constitution was not supposed to contain any bill of rights, and that no objection to it was proclaimed with more zeal, and pressed with more effect, than the want thereof. The Growth of the Constitution, by Meigs (1900), which, so far as we have examined it, appears to be correctly stated, and which is a convenient handbook with reference to the work of the Constitutional Convention, points out at pages 250 and 314 that the Constitution as originally adopted contained no bill of rights, and that the Convention being divided on the question, all attempts to frame one were dropped. Indeed we might dispose of this entire subtopic by reference to the opinion in Robertson v. Baldwin, 165 U. S., already referred to, according to what appears therein at page 281, 17 Sup. Ct. 329 (41 L. Ed. 715), as follows:

"The law is perfectly well settled that the first ten amendments to the Constitution, commonly known as the Bill of Rights, were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors, and which had from time immemorial been subject to certain well-recognized exceptions arising from the necessities of the case."

So far, therefore, from this proposition on the part of the United States impressing us, it indicates why it is that the constitution of a jury in criminal cases as to numbers as known to the common law

is a matter of governmental regulation, while several things which are secured by the amendments, and which may be waived by an accused person, are of a different character. It also assists in explaining the fact that, in accordance with the rules of the common law, some things may be waived, as, for example, the qualification of a particular juror or the right to a speedy trial, while it does not follow that, by analogy, a waiver may extend to any part of the provisions of article 3 of the original Constitution applicable hereto.

The judgment of the District Court and the verdict therein are set aside; and the case is remanded to that court for further proceedings in accordance with law.

ALDRICH, District Judge (dissenting). I concur in the majority opinion except that part which declares the trial invalid because the verdict was by 10 jurors rather than 12. The trial was constitutionally organized and had progressed at great length, in strict conformity with law, when a juror was discharged by order of court, by reason of sickness, and, near the close of a three months' trial, another juror was discharged by reason of death in the juror's family. This action was taken by the court, in both instances, upon full consent and agreement in writing of the accused and the proper representative of the government, and upon the further agreement that the trial should proceed with the same force and effect as if the jurors had not been discharged; and the trial was concluded with the remaining 10 jurors under the discretionary approval and order of court.

The doctrine of waiver, as applied to a trial which would be otherwise irregular, is of course not to be narrowly accepted as making an unconstitutional trial valid by contract, but is grounded more upon the idea that the agreement, consent, and conduct of the accused, with respect to a question not affecting the jurisdiction of the court, whereby he induces the court to go forward, and whereby he secures the chance of getting an acquittal, operate as a waiver of the right to raise the objection, in the event of an unfavorable result, that the course adopted was irregular.

The offense charged was statutory, the statute creating it declaring it to be a misdemeanor (section 5209), and the majority opinion seemingly concedes, what is true, that the books do not show any rule or practice in the English courts, prior to our Constitution, that a jury of 12 may not be weakened, in misdemeanor cases, upon waiver by the accused.

Our constitutional provision as to jury trial means the jury trial as used and practiced in England at the time of the adoption of the Constitution; and, under English history and authority, there is apparently no warrant whatever for the theory that, as jury trial was used and practiced in misdemeanor cases in England, an accused might not waive his right to object to irregularity due to the fact that his jury trial, once properly organized, had subsequently sustained a fractional loss.

While our Constitution does not expressly declare that a panel shall consist of 12 jurors, I do not take issue with the proposition that the

common-law number of 12 is required at the outset in cases of felony, or with the proposition that, in the higher grades of misdemeanors, trials should begin with that number.

Article 3, § 2, of the Constitution, which declares that the trial of all crimes, except impeachment, shall be by jury, and the sixth amendment, which provides that the accused shall enjoy the right to a speedy and public trial by an impartial jury, were, in a very large sense, if not altogether, something established for the benefit and protection of accused parties; and there is great force in the position of the government, that a trial by a jury of 12 is a guaranty or a privilege which cannot be withheld from a person accused, but is one which he may waive.

This position is especially strong in a case like this where the constitutional common-law jury was vouchsafed to the accused, and where, in the course of a long trial, sickness and death made it certain that the fruits of the trial must be lost, or its benefits saved to the accused and the government by consent to proceed with a less number than 12.

As recently said by Mr. Justice Holmes, in Interstate Consolidated Street Railway Company v. Commonwealth of Massachusetts, 207 U. S. 79, 28 Sup. Ct. 26, 52 L. Ed. ——, constitutional rights, like others, are matters of degree, and constitutional provisions are not to be pushed to a logical extreme, but must be taken to permit the infliction of some fractional and relatively small losses.

The aim of the constitutional safeguards in question is a full, fair, and public trial, and one which shall reasonably and in all substantial ways safeguard the interests of the state and the life and liberty of accused parties. Whether the idea is expressed in words or not, as is done in some of the bills of rights and constitutions, a free and fair trial only means a trial as free and fair as the lot of humanity will admit.

All will doubtless agree, at least the unquestioned authority is that way, that these protective provisions of the Constitution are not so imperative that an accused shall be tried by jury when he desires to plead guilty; or that his trial, in the event of trial, shall be held invalid for want of due process of law, based upon the ground that he was not confronted with his witnesses when he had waived that constitutional right and consented to the use of depositions; or because he had not had compulsory process for obtaining witnesses in his favor when he had waived that; or because he had not had the assistance of counsel when he had intelligently refused such constitutional privilege and insisted upon the right to go to trial without counsel; or upon the ground that he had not had a speedy trial when he had petitioned the court for delay; or that his trial was not public when he had consented to, or silently acquiesced in, a trial in a courthouse with a capacity of holding only 12 members of the public rather than 1200.

Beyond question, the right of an accused in a case like this to have 12 jurors throughout is so far absolute as a constitutional right that he may have it by claiming it, or even by withholding consent to proceed without that number, and doubtless, under a constitutional government like ours, the interests of the community so far enter into any

incidental departure from that number, in the course of the trial, as to require the discretionary approval of the court, and that the proper representative of the government should join the accused in consent.

I quite agree with the majority opinion as to the constitutional and practical importance of the question under discussion.

In the lot of humanity men fall sick and die, and if the constitutional safeguard is so hard and fast that an accused, who has been subjected to a constitutional trial for three months, cannot waive a fractional part of the right which he has enjoyed in order to save his substantial right and get a result, but must be subjected to the burdens of another trial with perhaps the same dilemma, it will become an instrument of oppression rather than one of protection, and thus the preventive would become something worse than the apprehended danger.

I do not agree that the historical jury of England, in respect to the number of 12, or in respect to waiver, as the right of jury has been administered in English proceedings, is quite as hard and fast as the majority opinion assumes, and I incline to the belief that the English jurist of to-day would be greatly surprised to learn that a jury trial in a misdemeanor case is constitutionally and historically invalid because a juror had been removed from the panel by reason of sickness or death, occurring in the course of the trial, and where the defendant freely and intelligently exercised his right of waiver, and where the Crown and the accused, under the discretionary approval of the court, waived all objections and formally consented in writing that the trial should proceed, and where such a course was adopted as something in the just administration of the law in respect to the rights of the defendant, and the rights of the government as well.

The case to which Forsyth refers, at page 241, in his History of Trial by Jury (41 Assis. 11), as having decided in the reign of Edward the Third, that a verdict by less than 12 was a nullity, and upon which reliance is placed by the majority opinion, has not the remotest application here, because in that case the jury failed to agree, and without consent a verdict of 11 was taken notwithstanding the disagreement. Consequently, neither the element of consent nor of waiver was present. That the rule is different with respect to verdicts upon consent is shown by a note to the English text, which explains that "at the present day a verdict by less than twelve is sometimes taken by consent of both parties."

It is, indeed, strange that so little is found in the English text-books and cases upon questions arising in the course of trials for misdemeanors in respect to eliminations from the English jury of 12, originally constituted in strict compliance with the formalities and requirements of law.

It is, perhaps, unnecessary to inquire whether dearth of English reasoning upon such situations is explainable upon the ground that the right of waiver, under circumstances of misdemeanors, is so plain and palpable under the maxim, "Quilibet potest renunciare juri pro

se introducto," that it has gone without extended discussion. Broom, *699.

The case of The Queen v. Sullivan, 8 A. & E. 831, 1 P. & D. 96, would seem to give support to the theory that in England the right of waiver under circumstances of misdemeanor would be accepted as of course. In that case, which was one of conspiracy, and as such, an offense of a higher grade, a juror, after the trial had been opened, arose and stated that he was on the grand jury that presented the bill. The prosecution offered to consent to his withdrawal; but, the defendants not consenting, and, according to the report of the case in Perry & Davidson, objecting to his withdrawal, the trial proceeded. After verdict the defendants moved for a new trial upon the ground that the case had been mistried. The point was taken that the verdict was only by 11, and that "so tender is the law of England of the lives of the subjects, that no man can be convicted at the suit of the King of any capital offense unless by the unanimous voice of 24 of his equals and neighbors; that is, by 12, at least, of the grand jury, in the first place, assenting to the accusation, and afterwards by the whole petit jury, of 12 more, finding him guilty upon his trial," and that the books did not warrant a limitation of this rule to juries sitting on capital cases. But Lord Denman disposed of the point against the defendants, without discussion, upon the ground of waiver.

In King v. Sutton, 8 B. & C. 417, one juror was an alien, and the point was taken that the decision of the jury was therefore void. Rule was refused by Lord Tenterden with very little discussion, but with the suggestion, if a new trial were granted under such circumstances at the instance of a defendant, that it would also have to be done at the instance of a prosecutor.

I will pass from the English cases involving crimes less than capital with the thought (1) that a rule that the government would not be held to have waived the constitutional point under such circumstances in cases of misdemeanor, and which would, as a result, subject the accused to a second trial, would be intolerably oppressive to him; and (2) if the fundamental rights of an accused in respect to the original constitution of the jury may be held to be waived by his conduct or silence there is no apparent sufficient reason why an accused may not voluntarily waive rights, in respect to incidents of his trial, by free, independent, and intelligent consent and agreement in writing, under the protecting advice of counsel, through which the substance of his intended constitutional trial is saved to him.

Now, as to analogous situations of great weight upon the question under discussion, because they involve waiver of English fundamental rights of a higher grade than those involved in misdemeanors:

The great privilege secured to English subjects by the common law, that no person shall twice be put in jeopardy of life and limb for the same offense, while not always treated in the books as fundamental because it relates to practice and to the just course of criminal procedure rather than to an original right, is far more essential and of vastly greater importance as a practical safeguard to life and liber-

ty than the right which gives the accused 12 jurors, rather than 11, throughout the trial, if he wants them.

Under our Constitution the fundamental right of the accused is to have the jury of 12. That having been furnished to him, whether it shall remain intact throughout the trial is something in the nature of an incident of the right, and if some fractional or relatively small loss is unavoidably sustained in the course of the trial it is a loss which is as much the loss of the accused as the loss of the government, such is "the lot of humanity." The question of waiving the fractional or incidental loss under such circumstances, therefore, stands upon a different footing than would a question as to the right of an accused to waive the fundamental or original right altogether.

In Kinloch's Case, Fost. C. L. 16–36, after the trial had opened the jury was discharged at the request of the defendant in order that he might raise certain questions upon demurrer, and, after the demurrer was disposed of, the question was whether putting him upon a second trial would be against the rule in respect to twice in jeopardy. The question, as stated at page 31, was whether, in a capital case, the court may not discharge the jury upon motion of the prisoner's counsel and at his own request and with the consent of the Attorney General before evidence given, in order to let the prisoner into a defense which, in the opinion of the court, he could not otherwise have been let into.

Kinloch's Case was carefully considered upon the theory (page 38) that discharging the jury was not a strain in favor of prerogative; that it was not done to the prejudice of the prisoners, but, on the contrary, was intended as a favor to them. Enlarging upon this theory it was said:

"In that light, I say, it was considered by the court; in that light it was considered by the prisoners and their counsel, and accordingly they prayed it; and in that light Mr. Attorney General, with his usual candor, assented to it; and in that light I know of no objection in point of law or reason to it; and therefore I am of opinion that judgment ought not to be arrested."

Thus the course which the first trial took was held not to operate as a discharge of the prisoners from a future trial for the same offense.

While the decision was not expressly based upon waiver, it was in fact based upon the principles of waiver, because, as reasoned, the prisoner, being relieved from the first trial upon his own consent and request and for a supposed benefit, should not be permitted to interpose the first jeopardy as a bar to a future trial.

Under an ancient and fundamental rule of law an accessory could not be legally indicted and convicted as accessory until the principal had been convicted, yet according to Lord Coke, applying the maxim, "Quilibet potest renunciare juri pro se introducto," he might waive that right and go to trial before the principal was attainted. 2 Inst. c. 14, p. 183.

It would seem, according to Sir John Kelyng's report of the Lord Dacre Case, that it was more a question there whether Lord Dacre could, in his own right, select a tribunal other than that of his peers than a question of waiver; at least, the effect of the reasoning of Rex v. Knowles, 12 St. Tr. 1167, 1196, is that it is not the right of a

peer to select his tribunal, because of the King's right and interest in the dignity and official titles of nobility.

The rule that a peer cannot in his own right renounce his privilege of being tried by his peers, and thereby select another kind of a tribunal, is doubtless based upon political and state considerations, and upon the idea that his title is not personal but an honor of inheritance, and that conviction of treason, which was the charge in Lord Dacre's Case, would work corruption of blood and a forfeiture of title. It is true enough that, if a peer were put upon trial for treason before a jury, he might in his own right arbitrarily insist upon a trial before his peers. The converse, however, is not true. Where a peer is put upon the Magna Charta trial before peers, he can no more in his own right waive that trial and take a jury trial than could a judge or a president under impeachment waive the constitutional trial before our Senate, and elect a trial by jury. Such a question of waiver was the one considered in the Dacre Case, and it sustains no analogy whatever to the kind of waiver before us.

It is manifest that the principle involved in Lord Dacre's Case in no way touches the question here, because, under the law of England, as will be seen, if the peer consents to have, and is given, a different kind of a trial than the one before his peers, he has by his conduct waived the right to object that the trial he has had is not the one he was entitled to under fundamental law. It thus follows that a peer who has voluntarily elected to take the chances of a trial by a jury of commoners will not thereafter be permitted to have a second trial by his peers, upon the ground that he could not waive, and has not had, the trial contemplated and vouchsafed by Magna Charta.

"It is as much the law of the land, that a peer be tried by his peers as a commoner by commoners. Yet if one who has a title to peerage, be indicted and arraigned as a commoner, and plead not guilty, and put himself upon his country, it hath been adjudged, that he cannot afterward suggest that he is a peer, and pray a trial by his peers." 4 Hawk. P. C. c. 44, § 19. Thus, under the doctrine of waiver, a peer loses his Magna Charta right of trial by his peers, which is at least as fundamental as the right of an accused in a misdemeanor case to have the exact number of 12 throughout his trial.

In respect to safeguards, distinction was made at an early time in England between the graver cases and cases of misdemeanors, and while the plea of guilty was discouraged in capital cases, it was received without hesitancy in other cases of felony and in misdemeanors, and while the trial of noblemen was by their peers in treason and felony, in misdemeanors, even of the higher grades, as libels, riots, perjury, and conspiracy, they were triable by a jury like a commoner. 1 Christian's Blackst. (12th Ed.) 401, note 7; 4 Christian's Blackst. (12th Ed.) 349, note 2; 3 Inst. 30; 4 Sharswood's Blackst. 259, and notes.

Under our law there is no express constitutional mandate that the jury shall consist of 12, though, without doubt, the right of the common-law number, as the right was administered in England, was in-

159 F.—52

tended; there is no constitutional mandate that waiver shall not be made in proper cases, and, while considerations of public policy are against waiver in capital cases, such considerations are by no means absolute and controlling in respect to prosecutions for misdemeanors.

Without discussing the question whether there is any precise line of distinction upon exact legal principles between the higher and the lower grades of crimes in respect to waiver, there are unquestioned and cogent reasons of public policy requiring the rule of strict construction which renders waiver inadmissible in capital cases that do not exist in any broad and substantial sense in prosecutions for the lower grades of offenses, although the same considerations of public policy doubtless, in a measure, but in a less conclusive sense, enter into the original constitution of the jury in other felonies and the higher grades of misdemeanors. When, in prosecutions for the lower crimes, a loss, not expressly covered by constitutional mandate, comes to a constitutional jury trial in progress, the question whether waiver is admissible, in a given situation, is apparently not to be determined upon an abstract legal line drawn between felonies and misdemeanors, · or between different kinds of felonies, or different kinds of misdemeanors, but upon sound discretion exercised with reference to the character and extent of the loss—whether the loss is so slight and fractional, and so far incidental, that its waiver would not offend public policy, or so vital and comprehensive as to dethrone the substance of the constitutional plan, thus presenting a situation which invokes the interposition of considerations of public policy against its waiver.

Whenever the progress of a constitutional jury trial is interrupted by a fractional and accidental loss from the panel, the practical question presented to the trial court always is whether the accused shall be allowed to waive the loss and enjoy the substance of his constitutional right and have the jury trial he wants, or whether public considerations are so strongly against it that waiver shall be denied to the end that he shall not enjoy the substance of his constitutional right and have the jury trial he wants.

There is no decision of the Supreme Court upon the precise point under consideration, and, while state decisions are numerous and involve diversity and conflict upon questions somewhat akin, though quite collateral in principle, there is very little discussion to be found in American text-books, or by state courts, upon the particular question with which we are dealing. The discussion along these lines is largely confined to questions of waiver in the course of trials in capital and other felony cases; to the right of waiver of the whole jury in cases involving misdemeanors; and to questions of right and of public policy as viewed in respect to questions raised against the jury tribunal as originally constituted; as, for instance, starting with a jury of less than 12, with jurors illegally drawn, with jurors absolutely disqualified, with jurors not sworn, and the like.

Commonwealth v. Dailey, 12 Cush. (Mass.) 80, is an authority in point in that one of the jurors was withdrawn, during the progress of the trial, from a panel properly constituted at the outset. This authority has not been followed in some jurisdictions where it was

sought to apply it in cases where the precise point which it covers was not involved. It will be found where it has been questioned by the courts in other jurisdictions and by text-writers that the doubt was evidently based upon the mistaken theory or supposition of a scope broader than the precise point decided, and as involving something beyond what was intended by the justly renowned jurist who pronounced the decision.

The doctrine of Commonwealth v. Dailey is not easily overturned or shaken. The decision was rendered in 1853, by a judge who, by common consent, stood next to Marshall as an American jurist, upon full consideration and careful reasoning, and upon self-imposed limitations, founded upon considerations of public policy, which renders it applicable only to cases of misdemeanors in which the jury, as originally constituted, consisted of 12 men, and for more than 50 years it has been generally accepted and followed, throughout the country, in the practical administration of criminal justice, in respect to incidents of misdemeanor trials in actual progress.

It is unmistakable that Chief Justice Shaw had in mind the very important distinction between cases starting with less than 12, and cases where there is a loss from that number upon trial. In the one instance there is some reason for treating the number as a fundamental essential, and there is no necessity for starting with less than 12, because the state has ample and ready means at hand for constituting a jury of that number, and nothing substantial is lost to the accused or the state by the slight necessary delay in doing it; while, in the other instance, the jurisdictional essential having been supplied, all the time, expense, and advantages, which attach to a properly constituted trial in progress, both as regards the rights of the accused and the interests of the state, are altogether lost, unless the accused party's constitutional right of jury is subject to waiver as to some possible fractional losses incident to contingencies and necessities resulting from sickness and death.

Moreover, the principle of Commonwealth v. Dailey was expressly recognized by the Supreme Court in Schick v. United States, 195 U. S. 65, 24 Sup. Ct. 826, 49 L. Ed. 99, where, after saying, "When there is no constitutional or statutory mandate, and no public policy prohibiting, an accused may waive any privilege which he is given the right to enjoy," and that "authorities in the state courts are in harmony with this thought," the opinion quotes approvingly the expression of Chief Justice Shaw, that "he may waive any matter of form or substance, excepting only what may relate to the jurisdiction of the court," and cites various state authorities sustaining the principle involved.

It would seem that Schick v. United States goes further in recognition of the right of waiver than Commonwealth v. Dailey, because it sustains the right of waiver of the entire panel in cases of misdemeanor.

It may, perhaps, be urged that the case at bar involves a graver misdemeanor than that in Schick v. United States; but does this furnish a sufficient reason for a distinction?

There is no constitutional or statutory mandate which draws a line in this respect between misdemeanors. Are there any considerations of public policy which interpose in one class of misdemeanors while not in another, and, if so, where is the line of cleavage to be drawn?

It is not important to inquire whether with us there is any offense answering strictly to the English felony, or whether there is any logical and general line of distinction between felonies and the higher misdemeanors, because not only was the offense, in the case at bar, created by statute, and declared to be a misdemeanor by the statute which created it, but it is, in its character, peculiarly one of misdemeanor, as it relates to demeanor and misconduct "in the business of one's office."

It may also be urged that the penalty prescribed for the offense charged in the case at bar—that of imprisonment—raises considerations of public policy not present in Schick v. United States. But is this a sufficient answer? Inability or failure to pay the fine prescribed in the oleomargarine case would result in imprisonment, and therefore the consequences of the danger supposed to lurk in a rule which would permit an accused to waive away his liberty are present in such a situation as much as in the other.

It is probable that the history and debates of the constitutional convention will not be found to sustain the idea that the constitutional safeguards in question were in any sense established as something necessary to protect the state or the community from the supposed danger that accused parties would waive away the interest which the government has in their liberties, and go to jail.

There is not now, and never was, any practical danger of that. Such a theory, at least in its application to modern American conditions, is based more upon useless fiction than upon reason. And when the idea of giving countenance to the right of waiver, as something necessary to a reasonable protection of the rights and liberties of accused, and as something intended to be practical and useful in the administration of the rights of the parties, has been characterized as involving innovation "highly dangerous," it would, as said by Judge Seevers in State v. Kaufman, 51 Iowa, 578, 581, 2 N. W. 275, 277, 33 Am. Rep. 148, "have been much more convincing and satisfactory if we had been informed why it would be highly dangerous."

So far as practical consequences to the liberties of accused parties are concerned, a hard and fast rule of law which denies the right of an accused to waive the loss of a juror, stricken from the panel by sickness or death, during the progress of the trial, would be far more dangerous and intolerable than would a rule which accords to an accused, upon written application, joined by the government, and under the approval of the court, the right to waive the fractional loss whereby he may establish his right to liberty and save to himself the expense, the delay and the oppressive imprisonment incident to another trial.

Traced to its English origin, it would probably be found, so far as the right of waiver was there withheld from accused parties, that

in a very large sense the reason for it was that conviction of crime, under the old English system, operated to outlaw and to attaint the blood and to work a forfeiture of official titles of inheritance, thus affecting the rights of third parties.

In every substantial sense our constitutional provisions in respect to jury trials in criminal cases are for the protection of the interests of the accused, and as such they may, in a limited and guarded measure, be waived by the party sought to be benefited.

The constitutional provision as to a jury is not so absolute as a government regulation, nor is the idea of a jury of 12 so apostolic as not to safely permit of a little relaxation, in a proper case, at the request, or upon the prayer, of the party most interested, to the end that he may have a speedy and practical administration of justice in accordance with the spirit and substance of the constitutional plan.

An order of court permitting a trial in progress to be concluded upon request and consent of an accused is always intended as something for his benefit and reasonable protection; and, while the right of 12 jurors to the end of the trial would never be denied an accused if he claimed it, and, while a cause would never proceed without the number of 12, except upon consent of the accused, withholding from him the right of waiver, under the idea of supposed danger to his liberty, when he wants to exercise the right in order to save the trial and get his liberty, would be something more in the nature of an act of oppression than of an act for his reasonable protection and security. And, when discretionary action is taken by the court, upon the request of an accused under advice of counsel, approved by the proper representative of the government, which preserves the substance of the constitutional tribunal, and which permits his trial to go on for his benefit and to the end that he may take the chance of securing an acquittal, he should not be permitted to set up the invalidity or irregularity of such a course; and this is so upon reasonable grounds of general good faith as well as upon principles of waiver and estoppel. That, doubtless, is the English view in respect to the application of such principles to analogous situations, involving weightier consequences in cases of felonies; and there is no sufficient reason why it should not hold good here in misdemeanor cases.

The case of Edwards v. State, 45 N. J. Law, 419, deals with constitutional provisions with respect to jury trials, and, upon careful consideration, accepts them as safeguarding rights and privileges established for the benefit of accused parties and as something which cannot be withheld but which may be waived; and the Supreme Court of New Hampshire, in the concluding paragraphs of the Opinion of the Justices, 41 N. H. 550, 552, without discussion or question, deals with the constitutional guaranty as involving a right which may be waived. See, also, State v. Almy, 67 N. H. 274, 280, 28 Atl. 372, 22 L. R. A. 744.

Upon the exact point decided in Commonwealth v. Dailey there is apparently no conflict of authority; and it is quite sufficient for present purposes to say that, so far as known, there is no case, not of

felony, in any jurisdiction, involving the precise question of the case at bar, which holds that an accused may not waive the loss of a single juror in the progress of his trial, from a panel originally constituted according to the forms of law, and the case of State v. Kaufman, 51 Iowa, 578, 2 N. W. 275, 33 Am. Rep. 148, extends the doctrine because that was a case of forgery, and though 1 juror was discharged and the trial resumed with 11, upon consent, the situation was accepted as not raising questions relating to the jurisdiction of the court, and it was held that the loss of a juror was something which might be waived by the accused. See, also, State v. Grossheim, 79 Iowa, 75, 44 N. W. 541.

To the same effect in misdemeanor cases are State v. Mansfield, 41 Mo. 470; State v. Sackett, 39 Minn. 69, 72, 38 N. W. 773; United States v. Shaw (D. C.) 59 Fed. 110, 114.

If the disqualification of a juror appears in the course of a murder trial, and the accused fails to object, he waives his objection, and a trial by 11 qualified jurors and 1 disqualified juror does not deprive him of a constitutional right which he may not waive. Queenan v. Oklahoma, 190 U. S. 548, 551, 23 Sup. Ct. 762, 47 L. Ed. 1175.

I do not look upon Queenan v. Oklahoma as meaning what the majority opinion claims for it. The question of waiver was in no sense rested upon the idea of 12 jurors, but upon the failure of the accused to press an objection which would have been fatal to the trial. It is unmistakable that the Oklahoma case recognized the idea of a proper application of the doctrine of waiver to matters of substance, as well as of form, in trials for the higher crimes. That case and the one at bar, under extreme logic, are not technically the same, in respect to the nature of the loss to the right of the accused; but it seems clear that the principle which renders the doctrine of waiver admissible in a case where the accused remains silent, and his trial for murder is concluded after he knows that one of his constitutional 12 is totally disqualified, would safely enough render it admissible in a trial for misdemeanor constitutionally begun, and concluded upon the express request of the accused after he knew that a juror had been discharged with his assent during the course of his trial. But, without regard to whether the two cases are precisely alike in principle, the plain meaning of the Oklahoma case is that the accused lost a substantial right through waiver. This is so because the tribunal was made up of 11 qualified jurors, and 1 disqualified juror who could not have been counted as a part of the constitutional 12 in the absence of the silent consent of the accused, and because the loss to his constitutional privilege of having 12 qualified jurors was so vital that the mere exercise of his right to object would have been fatal to the trial, yet by remaining silent he waived the right to object, and consequently the fractional loss which he had sustained. In short, he waived his right to have a full jury of 12 qualified men.

The authorities are numerous which go far beyond Commonwealth v. Dailey, and hold that an accused may waive a jury trial altogether in misdemeanor cases. Schick v. United States, 195 U. S. 65, 24 Sup. Ct. 826, 49 L. Ed. 99; Darst v. People, 51 Ill. 286, 2 Am. Rep. 301;

Logan v. State, 86 Ga. 266, 12 S. E. 406; State v. Woodling, 53 Minn. 142, 54 N. W. 1068; Ward v. People, 30 Mich. 116; Commonwealth v. Sweet (Quart. Sess.) 16 Pa. Co. Ct. R. 198; Id., 4 Pa. Dist. R. 136; State v. Alderton, 50 W. Va. 101, 40 S. E. 350; Morris Levi v. State, 4 Baxt. (Tenn.) 289, 292.

There are other cases holding that he may waive and go to trial with less than 12 in misdemeanor cases. State v. Van Matre, 49 Mo. 268; Murphy v. Commonwealth, 1 Metc. (Ky.) 365; Tyra v. Commonwealth, 2 Metc. (Ky.) 1; State v. Borowsky, 11 Nev. 119; State v. Cox, 8 Ark. 436; State v. Mansfield, 41 Mo. 470, 479.

Upon the extreme proposition that an accused, in cases involving certain grades of felony, may waive his constitutional right and go to trial with less than 12, as well as upon the less extreme proposition that he may waive the loss of a juror from a properly constituted tribunal, during the course of a felony trial, there is conflict, involving a field of discussion which we need not enter, because it is foreign to the question under consideration.

It is quite clear, from a careful reading of Commonwealth v. Dailey, supra, that Chief Justice Shaw had in mind a distinction between a case started with a deficient number of jurors upon consent and a case where a juror was withdrawn upon consent during the course of a trial.

It is likewise clearly manifest that Judge Cooley, Const. Lim. (7th Ed.) 458, 459, in presenting a view in the nature of a query and in speaking of the infirmity of a trial by a jury of less than 12 by consent as involving a trial in the nature of an arbitration, was directing his thought to the tribunal as organized at its inception, and even this view has the very significant qualification, "at least in case of felony."

So in Hill v. People, 16 Mich. 351, which was a case of murder, the question related to the original organization of the jury and to a defect which the accused did not know.

The question in Thompson v. Utah, 170 U. S. 343, 18 Sup. Ct. 620, 42 L. Ed. 1061, related not only to the proper organization of the trial at the outset, but to a substantial departure from the constitutional plan, in that the trial started with a jury of eight; and the case, moreover, involved a statute which was ex post facto in its application to the offense charged.

Likewise Chitty's Criminal Law, 505, refers to a petit jury when sworn rather than to an incidental loss in the progress of a trial.

The same is true of the irregularity in Hopt v. Utah, 110 U. S. 574, 4 Sup. Ct. 202, 28 L. Ed. 262, which raised the question whether the jury was originally organized according to the requirements of the Constitution; and the case in no way involved a consideration of express waiver as applied to an incident of a trial, or of any question as to the binding effect of waiver in respect to a fractional loss from a constitutionally organized tribunal during the course of a trial.

Not speaking now of questions of good or bad faith to courts charged with the administration of justice, or of general public considerations, a construction of the constitutional provision—establishing the

right of trial by jury as something for the general benefit of society, but for the special benefit of those accused of crime—which would compel, or permit, the government to stop and send an accused to another trial, and perhaps to repeated trials, in a misdemeanor case, through a denial of the right, when he wants to exercise it, to waive a fractional loss from a constitutional trial once entered upon, would often render the provision an instrument of oppression and, as a result, in many instances, "trial by jury itself, instead of being a security to persons who are accused, will be a delusion, a mockery, and a snare."