Ann J. WACKSMAN, Appellant,

v.

UNITED STATES, Appellee.

No. 2835.

Municipal Court of Appeals for the District of Columbia.

Argued Oct. 10, 1961.

Decided Dec. 7, 1961.

5. See Thomson v. L. C. Roney & Co., 112 Cal.App.2d 420, 246 P.2d 1017.

Leonard B. Sussholz, Washington, D. C., for appellant.

Marvin P. Sadur, Washington, D. C., also entered an appearance for appellant.

Frank Q. Nebeker, Asst. U. S. Atty., Washington, D. C., with whom David C. Acheson, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Nathan J. Paulson and Charles Thomas McCally, Asst. U. S. Attys., Washington, D. C., also entered appearances for appellee.

Before HOOD and QUINN, Associate Judges, and SMITH, Chief Judge of The Municipal Court for the District of Columbia, sitting by designation.

QUINN, Associate Judge.

Following a lengthy trial (producing a transcript 1,600 pages long as well as an exceptionally large number of exhibits), a jury found appellant guilty of violating 18 U.S.C.A. § 712, which makes it unlawful for a debt collection agency to employ misleading words or symbols "for the purpose of conveying and in a manner reasonably calculated to convey the false impression" of federal affiliation.[1] She appeals.

During the period specified in the charge, from January through May 1960, appellant conducted a "skip-tracing" service from an office in the District of Columbia. Intended to assist creditors in the collection of overdue accounts, "skip-tracing" undertakes to uncover and provide financial and other information about delinquent debtors. To accomplish this purpose appellant adopted a special card questionnaire of authoritative design as a means of eliciting the desired information from the debtors, their relatives, friends, business contacts, and other likely news sources. Upon order, she would send the desired quantity to the creditor directing that he complete the appropriate blanks with the names and addresses of the prospective informants and return the questionnaires. Appellant would then mark the cards with a code number identifying the interested creditor, insert them in brown, window-type envelopes, put them through a meter-mail machine, and have them mailed.

The questionnaire, entitled "Deposit System Certificate," gave no indication of the creditor's involvement or interest in the inquiry, but bore the name of appellant's organization, "National Deposit System," as sender. It was the use of this name, together with the general format of the questionnaire, which led to the institution of criminal proceedings. Other features of the questionnaire and its accompanying envelopes which created the impression of federal affiliation included: (1) pictures on the face of the card of an eagle with outstretched wings and a building with a flag on it; (2) several perforations in the card to simulate the use of business-machine processing; (3) the fact of mailing from the nation's capital; (4) the use of meter-mailing; and (5) the statement on the return envelope "Attention Department of Disbursements" though there was no such

1. Becoming effective November 20, 1959, the statute provides: "Whoever, being engaged in the business of collecting or aiding in the collection of private debts or obligations, or being engaged in furnishing private police, investigation, or other private detective services, uses as part of the firm name of such business, or employs in any communication, correspondence, notice, advertisement, or circular the words 'national', 'Federal', or 'United States', the initials 'U.S.', or any emblem, insignia, or name, for the purpose of conveying and in a manner reasonably calculated to convey the false impression that such business is a department, agency, bureau, or instrumentality of the United States or in any manner represents the United States, shall be fined not more than $1,000 or imprisoned not more than one year, or both."

department. These and other features were pointed up in appellant's advertising circulars, one of which graphically described the advantages of the service in the following terms:

"(1) Meter mailed from Washington, D. C. Proven far more effective than mail with the obvious 4¢ postage stamp. This one feature alone accounts for an additional 20% pulling power.

"(2) Designed on an IBM Tabulating Card with Live IBM Sorting Holes that forcefully says to your debtor, 'This card means business.' Electronically gang-punched to create to your debtor the impression you desire him to believe.

\*    \*    \*    \*    \*    \*

"(4) The Over-all Impressive Appearance Features: an Eagle, traditional and accepted symbol of authority \* \* \* Important-looking Building \* \* \* Old English Script \* \* \* Ingenious Typographical Arrangement \* \* \* All of these combine to paint the picture in your debtor's mind of the necessity for him to give you maximum information."

At trial the government called nine witnesses to describe their reactions to the questionnaires which they had received. All testified that they were led to believe that the cards came from the federal government because of their appearance.

Furthermore, the questionnaire held out the promise of money if the complete information were promptly forthcoming. It announced: "There is a sum of money on deposit for you not in excess of $100.00. Complete the reverse side of this form in full so as to expedite prompt mailing of your disbursement \* \* \*." In the advertising circular quoted above, appellant explained this technique:

"(3) The Promise of Something for Nothing, the strongest psychological appeal in existence, will insure an answer from your delinquent debtor.

Everyone responds to this virtually irresistible premise. The magic word Money is sure-fire assurance of the high rate of results!! Even the toughest debtors react to the magic word because Each Debtor Replying To This Form Receives A Monetary Reward For Doing So!"

It would perhaps be more accurate to say that each debtor expected payment in accordance with the promise. In fact, the "monetary reward" amounted to two cents for each completed questionnaire.

In defense appellant denied that she deliberately sought to create and trade upon the impression that "National Deposit System" was a branch of the federal government, and that lacking the requisite specific intent to do so, she had not committed a violation of 18 U.S.C. § 712. To negative specific intent appellant introduced into evidence an exchange of correspondence with her brother, an attorney practicing in Atlanta, Georgia, in which they discussed compliance with the statute prior to its effective date. He assured her that the placement of a legend reading "This is Not a department, agency, bureau, or instrumentality of the United States" on each of the cards would prove adequate, which advice she followed. Attacking this assertion of good faith reliance on advice of legal counsel, the prosecution asked on cross-examination whether appellant consulted her brother knowing that he had once been convicted and disbarred for the crime of receiving stolen property. The trial court overruled counsel's objection to this line of questioning. Appellant assigns this as error.

■ That an accused acted upon advice and approval of counsel may certainly be considered as evidence of good faith, but such consultation does not automatically confer an absolute immunity. Where one

"'\* \* \* fully and honestly lays all the facts before his counsel, and in good faith and honestly follows such

advice, relying upon it and believing it to be correct, and only intends that his acts shall be lawful, he could not be convicted of crime which involves wilful and unlawful intent; even if such advice were an inaccurate construction of the law. But, on the other hand, no man can wilfully and knowingly violate the law, and excuse himself from the consequences thereof by pleading that he followed the advice of counsel.' "[2]

An accused's knowledge of his attorney's background and reputation may be a significant factor in determining whether the consultation was arranged in this spirit—with honest motive and with confidence that the advice given would be correct—or merely as a shield against possible criminal prosecution. It is therefore proper to show the character and qualifications of an attorney under the theory that one honestly seeking advice is unlikely to confide in one he knows or even suspects is professionally incompetent, unreliable or dishonest. Such inquiry has been accepted as relevant in determining the defendant's state of mind in a malicious prosecution suit.[3] We believe that it was a proper consideration in this action, as was the fact of kinship between the attorney and appellant.

The matter of the conviction and disbarment did not stop with the cross-examination of appellant; it was raised for a second time on cross-examination when her brother took the stand. Appellant argues that this, too, was error because the witness had received a pardon from the State of Georgia some years earlier and had been reinstated as a member of the bar. In Rich-

ards v. United States,[4] our Court of Appeals reviewed this same problem at some length in connection with a defendant's reliance upon a presidential proclamation conferring a general amnesty for World War II servicemen previously convicted for federal violations. As the Court noted, Code 1951, 14–305 sanctions the use of prior convictions as a basis for impeachment under the theory that a background of criminality reflects upon the witness's trustworthiness. Since Richards's pardon was granted without concern for guilt or innocence, the witness's character was not fully restored. Such is the case here, for the pardon given to appellant's brother was not a determination that justice had miscarried and that he was wholly innocent of the crime. Rather, it was of the kind commonly given to first offenders who have given promise of reform.

■ We do find fault, however, with the deviation from the procedure authorized by Code 1951, 14–305. It prescribes the exclusive method of proving conviction, namely, by "certificate, under seal, of the clerk of the court wherein such proceedings were had, stating the fact of the conviction and for what cause * * *."[5] Notwithstanding this, the prosecution introduced an expanded record of the proceedings giving rise to the witness's conviction, including the indictment. This indictment specified fourteen different counts of receiving stolen property, only two of which resulted in conviction. The courts of this jurisdiction have repeatedly admonished that criminal accusations, arrests, and indictments are not legitimate subjects for impeachment.[6]

2. Williamson v. United States, 207 U.S. 425, 453, 28 S.Ct. 163, 173, 52 L.Ed. 278 279, 293 (1908).

3. See 34 Am.Jur., Malicious Prosecution § 76.

4. 89 U.S.App.D.C. 354, 192 F.2d 602, 30 A.L.R.2d 880 (1951).

5. Simms v. United States, 101 U.S.App. D.C. 304, 248 F.2d 626, cert. denied 355 U.S. 875, 78 S.Ct. 127, 2 L.Ed.2d 79 (1957); Clainos v. United States, 82

U.S.App.D.C. 278, 163 F.2d 593 (1947); Cormier v. United States, D.C.Mun.App., 137 A.2d 212 (1957).

6. Beasley v. United States, 94 U.S.App. D.C. 406, 218 F.2d 366, cert. denied 349 U.S. 907, 75 S.Ct. 584, 99 L.Ed. 1243 (1955); Sanford v. United States, 69 App.D.C. 44, 98 F.2d 325 (1938); United States v. Offutt, D.C., 145 F.Supp. 111, modified 101 U.S.App.D.C. 97, 247 F.2d 88, cert. denied 355 U.S. 856, 78 S.Ct. 85, 2 L.Ed.2d 64 (1957).

Consequently, not only was it improper to admit the indictment as to the two counts resulting in conviction, it was equally improper to put before the jury the other counts of which the witness was acquitted.[7] Nevertheless, after reviewing the entire record, we do not believe that this is cause for reversal. With the other evidence available, it is inconceivable that the inadmissible material could have had any substantial effect on the jury.[8] Moreover, appellant's objection was directed to the entire record of the witness's past conviction, a part of which was admissible. "In order that error may be predicated on the action of the court in overruling a motion, it must appear that the motion should have been sustained as a whole. It is no part of the court's duty to divide it, sustaining that which has a legal basis and overruling that which has not."[9]

■ Appellant next contends it was error for the prosecution to show the requisite specific intent by evidence that in promising to pay "up to $100.00," she only remitted two cents, while it cost the obliging party four cents to mail the completed questionnaire. We disagree. The fact of these inconsequential payments and the representations that appellant had money "on deposit" were deliberate deceptions to entice cooperation of card recipients. As appellant's sales materials disclosed, the lure of money was only one persuasive feature of her plan, another being the authoritative appearance of the card itself. The two being integral parts of a single plan for a single purpose, namely, to procure information, the intent to deceive manifested by the false promise of money was competent to show that the authoritative appearance of the card was also intended to deceive, just as one crime will be allowed to prove another when it tends to show intent.

■ Appellant also complains of the trial court's denial of a "missing witness" instruction because the prosecution introduced a card questionnaire sent to one Lila Stiggs, a resident of the State of Iowa, without calling her as a witness. We reject this contention on two grounds: (1) There was no showing that the witness was peculiarly available to the government, as required to invoke the rule;[10] and (2) The testimony of the uncalled witness would merely have been cumulative in view of the nine witnesses the government had placed before the jury.[11] Nor has appellant showed or attempted to show that this evidence would have been material to her defense.

■ Finding no prejudicial error in the conduct of the proceeding and ample evidence to support the jury's verdict, we conclude that appellant's conviction should be

Affirmed.

7. See Commonwealth v. Socci, 177 Pa. Super. 426, 110 A.2d 862, 863 (1955).

8. See Campbell v. United States, 85 U.S. App.D.C. 133, 176 F.2d 45 (1949).

9. Jackson v. United States, 48 App.D.C. 269, 272 (1919).

10. Krupsaw v. W. T. Cowan, Inc., D.C. Mun.App., 61 A.2d 624 (1948), and authorities cited therein.

11. Morton v. United States, 79 U.S.App. D.C. 329, 332, 147 F.2d 28, 31, cert. denied 324 U.S. 875, 65 S.Ct. 1015, 89 L. Ed. 1428 (1945). "It is necessary in the prosecution of a case that evidence and witnesses be sifted and selected with a view to economy of trial-time and the better understanding of the case by the jury. No useful purpose is served by using a scattergun."